UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                          :
EFFIE FILM, LLC,                                          :
                                     Plaintiff,           :
                                                          :        11 Civ. 7087 (JPO)
                    -against-                             :
                                                          :        MEMORANDUM AND
EVE POMERANCE, a/k/a EVE MOSSEK,                           :              ORDER
                                     Defendant.           :
                                                          :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

     This copyright case, involving a film and three screenplays, presents questions about the

protection of historical fiction under American intellectual property law.  Eve Pomerance owns a

copyright in two screenplays about the dramatic and intertwined lives of John Ruskin, John

Everett Millais, and Euphemia ("Effie") Gray—two stars of the Victorian art world and the

intriguing woman who was married to each of them.  Emma Thompson has written a screenplay

about the same historical figures; her screenplay has since been turned into a film that stars

Thompson, Dakota Fanning, and Robbie Coltrane.  In response to a threat of litigation, Effie

Film sued for a declaration of non-infringement and, five months later, moved for judgment on

the pleadings under Rule 12(c).  For the reasons that follow, that motion is granted.

I.     **Background**

     A.     **Factual Background and Procedural Posture**

     Victorian England, famed for its cultural achievements, high political drama, and sexual

mores, remains a rich source of inspiration for historians and artists.  For generations, authors,

composers, dramatists, and scholars have been drawn to the story at the heart of this case—a

story that involves two major figures of the Victorian art world, John Ruskin and John Everett

Millais, and a woman, Euphemia Gray, who married Millais after annulling her notoriously

unhappy marriage to Ruskin on the scandalous ground of non-consummation.  *See, e.g.*, Suzanne

Fagence Cooper, *Effie: The Passionate Lives of Effie Gray, John Ruskin and John Everett*

*Millais* (2011) (history); David Lang, *Modern Painters* (1995) (opera); Eva McDonald, *John*

*Ruskin's Wife* (1979) (novel); J. Murray, *The Order Of Release: The Story Of John Ruskin, Effie*

*Gray And John Everett Millais Told For The First Time In Their Unpublished Letters* (1948)

(primary sources); Van Dyke Brooke, *The Love of John Ruskin* (1912) (silent film).

      Eve Pomerance and Emma Thompson have both contributed to the corpus of works about

the Ruskin-Gray-Millais affair.  Pomerance authored and copyrighted two screenplays: *The King*

*of the Golden River* ("*King*") and *The Secret Trials of Effie Gray* ("*Trials*").  Thompson later

authored a screenplay, entitled *Effie*, and registered it with the United States Copyright Office.

Thompson subsequently assigned to Effie Film, LLC ("Effie Film") exclusive ownership of her

copyright in *Effie* and all rights in the screenplay, including the right to produce a motion picture

on the basis of the screenplay and to seek declarations that the screenplay (or any film based on

it) does not infringe on others' copyrights.  A film based on the screenplay, starring Dakota

Fanning, Robbie Coltrane, and Thompson, is expected to be released in 2013.

      On October 4, 2011, counsel for Pomerance sent a letter to counsel for Effie Film setting

forth a claim of copyright infringement and alleging eleven similarities between *Effie* and *Trials*.

On October 7, 2011, Effie Film filed this suit to obtain a declaratory judgment that *Effie* does not

infringe *Trials*.  (Dkt. No. 1.)  On October 31, 2011, Pomerance filed an answer and alleged

counter-claims against Effie Film and Thompson for copyright infringement.  (Dkt. No. 7.)  Five

months later, on March 16, 2012, Effie Film filed a joint motion for judgment on the pleadings as

to its declaratory judgment suit and to dismiss Pomerance's counterclaims pursuant to Rule

12(b)(6).  (Dkt. No. 16.)  In a letter dated May 8, 2012, Pomerance notified the Court of her

decision to drop her counter-claims against Effie Film and Thompson.  (Dkt. No. 25.)  Two days

later, Effie Film notified the Court that it intended to defer any response to Pomerance's

statements in the May 8, 2012 letter because Effie Film intends to move for an award of

attorney's fees pursuant to 18 U.S.C. § 505 in the event of judgment in its favor.  The parties

then finished briefing Effie Film's motion for judgment on the pleadings.

     Over the course of this briefing, the Court ruled—or the parties stipulated—that the three

works at issue in this case are *King*, *Trials*, and the post-filming version of *Effie*.[1]  The Court

holds that the operative pleadings have been impliedly amended to reflect that state of affairs.

Accordingly, Plaintiff now seeks a declaration that the post-filming version of *Effie* does not

infringe Pomerance's copyright in either *King* or *Trials*.  Before turning to the applicable rules of

law, the Court summarizes each of the disputed works.[2]

### B.    The *Effie* Script

     *Effie* opens with a foreshadowed scene in which a doctor examines Effie for signs of

virginity and describes John as "mad."  (Sc. 1.)  The script then falls back in time to when John

---

[1] The Court thus reaffirms its prior holding that only the post-filming version of *Effie* is presently at issue.  *See Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir. 1986) (noting that "the finally released version of the film was the best and most relevant evidence on substantial similarity").  Specifically, the Court has examined the "Venetian White Revisions" to the *Effie* screenplay dated November 28, 2011.  (Pl. Ex. 1, Dkt. No. 19.)  Further, Defendant raised the specter of litigation with respect to both of her copyrighted scripts (*King* and *Trials*), and both parties have represented to the Court their view that *King* and *Trials* are at issue in this case.

[2] To avoid confusion, the Court has artificially standardized the names of the main characters across all three summaries.  "John Ruskin" is referred to as "John."  "John Everett Millais" is referred to as "Millais."  "Margaret Ruskin," John Ruskin's mother, is referred to as "Mrs. Ruskin."  "Euphemia Gray" is referred to as "Effie."  Other names—notably Anna and George— are used to refer to different characters in each of the works.  For example, "George" is John's manservant in *Effie*, but Effie's father in *King* and *Trials*.  When those characters appear, their relationships to the other characters for purposes of that work are noted.

3

and Effie first met; John explains a Bernini sculpture (entitled "Apollo and Daphne") to a much younger Effie.[3]  (Sc. 2.)  This dialogue reveals a strong intellectual and personal connection between John and Effie, and introduces themes of female purity, perfection, and escape.  Moving forward, in scenes glimpsed quickly between flashes of John frantically sketching Effie, she startles a paramour with news of her engagement to John, and John is shown preaching his aesthetic theory to members of the pre-Raphaelite Brotherhood.  (Scs. 6-9.)[4]  Effie is then depicted reassuring her concerned younger sister, Sophie, that all will be well after the marriage; Effie mollifies Sophie with the promise that "you'll come and stay in London!"  (Sc. 10.)  A marriage scene immediately follows, in which Effie's parents appear briefly and Ruskin describes Effie as "a Muse, not just for the inspired instant but for all Eternity."  (Scs. 12-13.)

After the wedding, John and Effie are shown aboard a train to London.  In an early sign of discord, Effie promises "never to wear anything too excessively yellow" because "I know how it upsets you," notwithstanding her earlier promise to Sophie that "we'll go to parties in beautiful yellow dresses and we'll dance with musicians and poets and great artists . . . ."  (Scs. 10, 15.) John smiles, rearranges Effie's hair, sits back in his chair, and deems Effie "perfect."  (Sc. 15.)

Their travels end at John's gloomy Victorian mansion in Denmark Hill, where Effie strikes up a friendly relationship with a young manservant named George, who is plainly smitten with her.  (Sc. 20.)  We are promptly introduced to Mrs. Ruskin, a domineering mother who comes across as proud, controlling, and hostile.  In her eyes, Effie is a potential interloper into

---

[3] "JOHN:  She is the nymph, Daphne.  He is the god Apollo.  He wants her with an overwhelming desire.  He wants to possess her purity.  But she does not want him and turns herself into a laurel tree.  In order to escape."  (Sc. 2.)

[4] "JOHN:  Finally, remember this and only this:  Nature must rule every stroke of your brush. Only in representing Her as she truly is, selecting nothing, scorning nothing, will you reveal God's truth.  To put it simply, gentlemen—paint what you see.  Draw what you see."  (Sc. 8.)

her household and relationship with John.  Mr. Ruskin, John's father, seems pleasant and patient with his wife's stern ways.  (Scs. 21-22.)  Effie admires a newly acquired work by J.M.W. Turner while Mr. Ruskin raves about its expense and John's role in securing Turner's reputation. (Sc. 23-24.)  Effie is shown to her room, where she meets Anna, a cheerless and stiff servant. (Sc. 25.)  Over an awkward dinner, Mrs. Ruskin treats Effie coldly, frets endlessly over her son's genius and health, and heaps scorn on Effie's native Scotland, though John seems alert to his mother's hostility and smiles reassuringly at Effie.  (Sc. 26.)

As they prepare for their first night as man and wife, Effie appears in her nightgown and John says "you are perfect."  (Sc. 29.)  Then the scene jumps forward, across something awful, to Effie crying.  (Sc. 31.)  The next day, John is pleasant but distant.  Alarmed by Effie's suggestion that they spend time together, he sends her to explore the garden with his mother.  (Sc. 36.) Outside, Mrs. Ruskin viciously warns Effie away from her roses and emphasizes that "you have married no ordinary man . . . the best way – the *only* way in which you can help him is by leaving him alone."  (Sc. 37.)  Later that day, again in the garden, Effie broaches with John the question of children and describes her desire for a house and family.  John is silent.  (Sc. 41.) The same night, Mrs. Ruskin castigates Effie in front of her husband.  In a separate scene, John reacts with disgust when he witnesses Effie urinating in a chamber pot.  (Scs. 42-43.)  Effie's relationships with Anna and Mrs. Ruskin grow colder in the scenes that follow.  (Scs. 45-46.)

John and Effie are invited to dinner at the Royal Academy.  Effie presents herself to the Ruskins in a bright pink dress, causing "genuine alarm."  (Sc. 55.)  In the next scene, Effie appears at the Academy in a somber evening outfit.  (Sc. 56.)  Guests hotly dispute the merits of the paintings on display.  John rises and passionately defends the pre-Raphaelite artists, with specific reference to a painting by his friend Millais, prompting jeers and cries of support.  Over

5

dinner, Effie befriends Lady Eastlake, wife of the President of the Academy, who proposes that Effie invite her and her husband to dine.  Mr. and Mrs. Ruskin, snobby social climbers, are stunned by the chance to host such distinguished guests.  (Sc. 57.)

The Ruskins scramble to clean and adorn their house.  (Sc. 62.)  Meanwhile, Effie grows ashamed of her body and is terrified when she wakes up one night to the rhythmic sound of John masturbating on the other side of the bed.  (Scs. 65-66.)  The day of the dinner, Effie develops an overpowering headache.  Through Anna, Mrs. Ruskin forces medicine on Effie; Effie protests that "she means to poison me," but ultimately drinks while sighing "anything for a quiet life." (Sc. 72.)  After a discussion about Venice over dinner, Lady Eastlake notices Effie's absence and seeks her out.  Effie confesses to Lady Eastlake her feeling that the marriage was a mistake and her sense that Mrs. Ruskin will never let John go.  Lady Eastlake tells Effie that "it is a mistake you will have to live with," suggesting that children may ease the burden.  Effie replies that John does not like children.  Lady Eastlake tells Effie to feel free to call upon her for help.  (Sc. 76.)

Mr. Ruskin is furious that Effie cost him a graceful evening with the President of the Academy.  (Sc. 79.)  He takes his anger out on John, prompting John to berate Effie that night. She is defensive, then turns to hysterical laughter, and concludes by sobbing uncontrollably.  The scene ends with Effie's unheard plea: "We need our own home . . . ."  (Sc. 80.)

The next scene opens in Venice.  John has begun a book about Venetian architecture. Freed from Denmark Hill and from Mrs. Ruskin, Effie flourishes.  (Scs. 81-83.)  Amidst the bright scenery, Effie strikes up a friendship with a young Italian, Rafael, who guides her around the city's sights, parties, and waterways.  When they first meet, John and Rafael engage in a

tense back-and-forth over Effie's perfection.[5]   (Sc. 85.)  Rafael realizes that Effie's marriage is

an unhappy one.  (*Id.*)  In Venice, even as John sorts the beautiful from the ordinary, he remains

cold toward Effie.  (Sc. 96.)  One night, after Effie enjoys herself at a party, she returns home to

a lecture in which John scolds Venice (and perhaps her), stating that "once she was a Virgin and

now she is a harlot addicted to nothing but pleasure and voluptuousness."  (Sc. 103.)  When Effie

shows John a daguerreotype of Bernini's "Apollo and Daphne," John does not recall the

sculpture's significance to their relationship.  (Sc. 105.)  Meanwhile, Effie and Rafael grow

close—a blooming relationship that Rafael treats as a sexual invitation.  He thrusts himself at

her, but she runs away.  Distraught, she starts suffering hallucinations in which she sees her skin

covered with tree bark—just as Daphne, the nymph, escaped lustful Apollo through

metamorphosis into a tree.  (Scs. 109-112.)

   The script returns to Denmark Hall, where Effie's attempt at a bold sexual advance

toward John is interrupted by Mrs. Ruskin, who insists that Effie take pills and charges her with

madness after a scuffle.  (Sc. 114.)  A doctor examines Effie and describes her hallucinations as

symptoms of a malady best cured with "simple love and attention."  He also recommends time

---

[5] "JOHN:  Such beauty.
RAFAEL:  I think, like living with a beautiful woman, you stop seeing the beauty after a time and
see only the faults.
   *John regards him with gravity.*
JOHN:  But the faults *are* the beauty
   *Rafael Laughs.*
RAFAEL:  In palazzo, perhaps – but in women –
   *Rafael shakes his head.  He looks behind back at Effie and his mother, arm-in-arm,*
   *unaware that they are under discussion.*
RAFAEL (Cont'd):  Your wife is charming, so charming and still with her bloom so – she has no
faults.
JOHN:  She has plenty of faults.
RAFAEL:  Enough to make her beautiful?
   *John is silent.*

7

spent back in Effie's native Scotland.  (Sc. 117.)  In the next scene, Lady Eastlake encounters

Millais, who informs her that he has been commissioned to paint a portrait of John in Scotland.

(Sc. 118.)

In the Highlands, John, Effie, and Millais stay together in a small cottage while Millais

paints a portrait of John standing by a riverside.  John and Millais grow closer while playing in

the loch and discussing the portrait.  (Scs. 119-121.)  Millais also grows close to Effie.  He

comforts Effie when she receives word that her mother miscarried for the seventh time and he is

troubled when John seems indifferent to the news.  (Scs. 122-23.)  When Millais injures himself

out in the woods, Effie runs out, accidentally falls on top of him, and then comforts him back in

the cabin.  (Scs. 127-130.)  Millais teaches Effie how to paint and shows Effie a drawing of her

tending to his wound.  (Sc. 132.)  John then heads off to Edinburgh to deliver a lecture, leaving

Millais and Effie alone, though over Millais' breezily dismissed protests of impropriety.  (Sc.

133.)  While John is away, the two grow closer.  Millais reveals that John does not intend to have

children, news that devastates Effie.  (Sc. 135.)  Shortly thereafter, Effie sees Millais naked as he

emerges from a loch.  (Sc. 136.)  In the cabin, she cries at his kindness. (Sc. 138.)  They are in

love.

When John returns, Millais sees how coldly his patron treats Effie.  (Sc. 142.)  Millais is

tormented by his love for Effie and hatred toward John.  (Sc. 143.)  Late that night, Millais says

he "cannot bear to witness any more of your . . . torture," but Effie replies that "there is nothing

to be done."  (Sc. 144.)  John, who only appears to be asleep, overhears this exchange.  (*Id.*)  In

the next scene, Millais nearly finishes his portrait of John, which assumes a sinister cast without

a face or hands.  (Sc. 146.)  Ultimately, as John and Effie prepare to return home, Effie declares

her hatred of Denmark Hall: "I cannot go back."  (Sc. 147.)  John reacts with fury, threatening

8

her with loss of reputation because of her "behavior here"; Effie replies, almost inaudibly, "I hate you." (*Id.*) Before they leave, Millais urges Effie to invite an ally to Denmark Hall. (Sc. 148.) Millais acknowledges that he cannot visit her. Ultimately, Effie invites Sophie. (*Id.*)

Back in Denmark Hall, Sophie visits the Ruskins amidst a tangle of unspoken implications and chilly subtext. (Sc. 150.) Effie confronts John about their marriage and he replies: "Our marriage is the greatest crime I have ever committed . . . you snared me. Just like you have snared poor [Millais]. Wicked. Wicked." (Sc. 151.) John and Mrs. Ruskin manipulate Sophie, showering her with praise and knife-edged comments about Effie—who overhears part of Mrs. Ruskin's graceful character assassination. (Scs. 152-54.) Effie finally seeks help from Lady Eastlake, confessing that she has never had marital relations with John because "he was disgusted by my body that first evening." (Sc. 159.) Stunned, Lady Eastlake promises to look into the legal and social norms that might allow non-consummation to nullify the marriage. (*Id.*) In the next scene, Effie discusses annulment with a lawyer, who carefully examines a report concerning her virginity prepared by Dr. Lee, the doctor who examined her in the foreshadowed scene at the beginning of the script. (Sc. 162.) Effie spends the night terrified that John will attempt to consummate the marriage. (Sc. 163.) The next day, as John scolds her for her continued defiance, Effie receives a letter from her attorney—but pretends it is a request from her mother that Effie and Sophie visit Scotland. Millais is then shown scowling with steely determination at the portrait of his nemesis. (Sc. 167.)

Effie prepares to leave Denmark Hall. She encounters George, who has clearly guessed at her plans and wishes her well. (Sc. 168.) As Effie and Sophie's carriage departs, Effie pulls off her ring to send back to John; simultaneously, Millais' portrait of John is delivered to the Ruskin household. (Scs. 171-72.) The Ruskins assemble around the mantelpiece to admire their

new painting.  (Sc. 175.)  Moments later, Effie's lawyer arrives at the door and informs John that

Effie has sought annulment of the marriage on the ground of impotency.  (Sc. 177.)  Meanwhile,

Effie has sent Sophie to Millais.  The scene darts between their dialogue and the sight of Effie

looking up at Millais' studio.  Sophie tells Millais that Effie loves him, but "you are not to go to

her" because "she is not fit to marry for a time – without – much deliberation . . . because it

would never do to be wretched twice."  (Scs. 178-82.)  Millais' reply, conveyed to Effie by

Sophie, is simple: "Tell her that I look forward to her – no, to making her very happy."  (Sc.

183.)  Effie smiles, the carriage pulls away, and Millais rushes down to the pavement to see

Effie's carriage fade into the distance.  (Scs. 184-85.)  The film's closing titles reveal that the

marriage was annulled on the ground of incurable impotency, Effie and Millais married and had

eight children, and John eventually descended into madness.  (Sc. 186.)

> C.     The *King* Script

*King* opens with the foreshadowed scene of Effie, child-like and lit with moonlight,

stepping into a lake, sinking into the water, and panicking as she drowns beneath the weight of a

luminous white gown.  (Sc. 1.)  The film flashes back to Denmark Hall, 1837.  Effie and John

meet for the first time when John, looking up as he writes, notices a young girl dancing outside.

(Scs. 4-7.)  John introduces himself and caresses Effie's hair while reading her a fairytale—

which he then gives to her when she is summoned away by her father.  (Sc. 8.)

Ten years later, Effie and her father George attend a lecture at the Royal Academy.  In

the lecture, John brilliantly explicates a painting by J.W.S. Turner.  While he speaks, drawing the

fixed attention of all ladies in the room, John's eyes settle on Effie.  (Sc. 9.)  After John's talk,

Millais attempts to introduce himself, but is sharply rebuffed and told to seek an appointment.

(Sc. 10.)  While John chats with Turner and Charles Dickens, George suggests that Effie relieve

her boredom by stepping out to the garden.  George approaches John and reminds him of prior business, prompting John to inquire after Effie and then to join her in the garden.  (Sc. 12.)  They discuss flowers and John places a rose in Effie's hair.  George arrives and indicates that they must leave, leading John to protest and invite them to the Kew Gardens.  (Sc. 13.)  John and his mother discuss these plans and Mrs. Ruskin says she would like to meet Effie.  (Sc. 14.)  John and Effie bond over a walk in the gardens; John is pleased that Effie has "not lost any of that youthful beauty" and affirms that he wants to remain close.  (Sc. 16.)  In the next scene, John lies with his head in Mrs. Ruskin's lap as she applies medicine for his cough.  John says he wants to marry Effie.  When Mrs. Ruskin protests and says that she will move out, John replies that "my dearest wish is for us all to live together."  (Sc. 17.)

John visits Effie and her mother Anna in Scotland.  John guides Effie's hand as she paints, but is disappointed when Effie does not recall their meeting ten years earlier—though she does recall the fairytale, entitled "The King of the Golden River."  (Sc. 22.)  John reveals that he has loved her since "the first moment that I saw you in my parent's garden" and asks Effie to marry him.  She agrees and is about to kiss him, but then suddenly he pulls back.  John, Effie, Anna, and Sophie go to George, who approves of the engagement.  In the next scene, the Grays and Ruskins discuss the wedding and, at the Ruskins' urging, agree on a small affair.  (Sc. 24.)  As the wedding approaches, Anna warns Effie that it will take hard work to win over Mrs. Ruskin and Mrs. Ruskin tells John that she will not attend the wedding in Scotland.  (Scs. 25-26.)  The wedding scene reveals a happy couple and a first kiss.  (Sc. 27.)  Anna and Sophie say a tearful good bye and Sophie promises to visit Effie.  (Sc. 28.)  The newlyweds are shown aboard a steamship.  John tells Effie "you are perfect to me."  (Sc. 30.)

11

The wedding night is pictured in detail.  John slowly and clumsily undresses Effie.  She shivers and breathes heavily.  John's breathing grows irregular and he orders her to turn around so he can see her.  He refuses to make eye contact and starts caressing her body.  He mounts her and parts her legs, but then rolls off and onto his side, curling up like a child.  She presses for detail on what has gone wrong; eventually, John tells her "we can not lie together as man and wife" because he does not want a child while his career demands travel.  Effie is anguished. John "sits by the fire with the Bible open on his lap; all colour gone out of his face."  (Sc. 31.)

Back at Denmark Hall, Effie meets a group of unwelcoming servants, including Joseph and Marjorie.  (Sc. 33.)  Mrs. Ruskin shows Effie around the house and insists that Effie wear a formal dress, which John absolutely despises.  This is clearly Mrs. Ruskin's plan.  (Scs. 37-39.) Effie then ignores John when he knocks on her door, but after seeing two lovers outside, she sneaks into John's study and tries to kiss him as he sleeps.  (Scs. 40-46.)  John wakes in a panic and yells at Effie.  (Sc. 47.)  Regretful, he then apologizes and asks if she still loves him.  Effie says she does, and makes John promise to take her with him to Venice—much to his mother's chagrin.  (Scs. 47-48.)  Mrs. Ruskin then concocts a scheme to make it appear as though Effie stole the manuscript for John's new book, leading John to attack Effie and call her a "thief and a liar."  (Scs. 54-56.)  Mrs. Ruskin comforts her son, who replies by saying "I love you."  (Sc. 58.)

The scene shifts to Venice.  Effie and John are shown being affectionate, though John grows irritated that Effie admires other couples instead of focusing on the Venetian architecture. (Sc. 59.)  Effie shops for a glamorous dress that horrifies John, who "gazes on his wife, as if she has been transformed into a vulgar Whore" and insists that she wear a different dress to the ball. (Sc. 61.)  John tightens Effie's corset so fiercely that her breasts disappear; Effie can tell that John is pleased.  (*Id.*)  At a Venetian ball, Effie flirts and dances with Austrian officers, angering

12

John.  As the night spirals out of control, an officer forces Effie to keep dancing and John grows angrier and dizzier.  John finally reaches Effie and is almost killed when he tries to separate her from the solider.  Back in their room, he accuses her of acting like "a common whore," says that "you are weak, just like the rest of them," and leans in as if to rape her.  But he instead violently shoves the fabric of Effie's skirt between her legs.  (Sc. 66.)

Back in London, John purchases a dress for Effie that makes her look like a child.  (Sc. 69.)  Millais calls on John, who does not recall meeting him at the Royal Academy, and asks John to write about his new artistic movement—previously unknown to John—called the pre-Raphaelite Brotherhood.  (Sc. 71.)  Effie briefly meets Millais and is intrigued, but John is contemptuous of Millais and annoyed at Effie.  (Scs. 71-72.)  John tells Effie that "it was selfish of me to marry you" and, when Effie objects that their marriage is a success, he reduces her to tears by retorting that "happiness is something I know nothing about."  (Sc. 73.)  That night, Effie overhears John telling Mrs. Ruskin that his wife will "not lie with me."  Effie immediately sneaks back to her room.  Moments later, Mrs. Ruskin arrives at Effie to scold her daughter-in-law and is nonplussed when Effie tells her "to ask [John] why he will not lie with me."  Mrs. Ruskin calls Effie a liar.  Effie is traumatized.  (Sc. 78.)  She walks out into the snow and leans against skeletal apple trees.  John watches from his window, but finds himself unable to approach his wife.  He is lonely and filled with despair.  (Sc. 82.)

The script cuts forward in time.  John visits his friend Turner, but is scandalized to discover that Turner patronizes prostitutes and paints pictures of vaginas: "This is not art. –It is *sickness*."  (Sc. 85.)  John grabs a fistful of the sexual images and thrusts them into the fireplace; Turner grapples with John, who flees the building.  (*Id.*)  John then visits Kate Greenaway, an old acquaintance painting a portrait of a ten year old, Lily.  (Sc. 89.)  Greenaway shows John

13

pictures of Lily, noting that "she looks much more natural without her dress." John's breathing grows labored and he is mesmerized as he watches Lily button up her coat. Greenaway invites John to help and "smiles knowingly" as John shyly approaches the young girl. (*Id.*) Back at home, Effie approaches John and tries to touch him, but he pushes her away and demands that Effie apologize to Mrs. Ruskin. Effie refuses to do so and storms out. (Sc. 90.)

John is then shown with Millais, having written a glowing review of Millais' work. (Sc. 91.) Millais shows John sketches of Ophelia, the moment before she drowns. John insists that Millais use the Highlands as his landscape and invites Millais to join him, Mrs. Ruskin, and Effie on a trip to Scotland. The group sets off for Scotland after a scene in which Effie is embarrassed by the directness of Millais' gaze. (Sc. 92.) After passing through the Scottish Highlands, the four characters arrive at a small, white-stone cottage near a large loch. (Scs. 93-94.) The sexual-romantic tension between Effie and Millais builds: he leans a folder against her knee, he stares at her face, and their bodies brush against one another as they enter the cabin.

John, Effie, and Millais row out into the loch. Effie comments on the beauty of it all and Millais "smiles at Effie, obviously moved by her." (Sc. 97.) John identifies his favored spot for the Ophelia landscape and, recalling the foreshadowed scene that opens *King*, recites the Ophelia soliloquy from memory.[6] That evening, Mrs. Ruskin and John praise Millais' painting, and John explains his theory of aesthetics. (Sc. 99.) John tells Millais that Effie suffers from melancholia. (*Id.*) In the next scene, Effie comes upon Millais painting as she rows across the loch. They draw close, but only for a moment before Effie distances herself. (Sc. 100.) Effie remarks that

---

[6] "RUSKIN (Cont'd): There is a willow grows askant the brook. There on the pendent boughs her crownet weeds, clambering to hang an envious sliver broke. When down her weedy trophies and herself fell in the weeping brook. Her cloths spread wide, and mermaid like a while they bore her up, which time she chanted snatches of old lauds, as one incapable of her own distress.

she finds the painting very sad, since "death is the only way out for [Ophelia] . . . he does not love her."  Millais replies: "She could leave.  No one is stopping her."  But Effie states simply, "no, that is impossible."  Effie picks up Millais' model Ophelia dress, puts it on, and wades into the water.  Millais is horrified when he realizes what is happening and wades into the loch to save Effie.  She changes back into her clothing in front of Millais, who looks down and grows aroused; when she asks him to fasten her dress, the sexual tension thickens and Effie leans forward to kiss Millais.  The kiss is passionate, but Millais draws back, objecting that she is married.  Effie reaches for him: "There is no love between us . . . he will not touch me or look at me."  She confesses her virginity.  (Sc. 100.)  Effie and Millais embrace.  John, examining the local birds through his binoculars, sees them kiss.  His face grows pale.  (Sc. 101.)

That night, John invites Millais to join him for a post-dinner nightcap.  (Sc. 102.)  John, holding a shotgun against his leg, reveals that he is aware of the love between Effie and Millais.  He orders Millais to leave at first light.  By the time Effie awakes, Millais has left.  Effie grows tearful at the news and rows out into the pouring rain, pulling up short of the spot where she and Millais embraced.  (Scs. 103-104.)  On the way back to Denmark Hall, John brings Effie to her family's house.  Anna asks Effie when she plans on having a child, but Effie avoids the question.  (Sc. 107.)  John reads "The King of the Golden River" to Sophie.  (Sc. 110.)  That night, Effie discovers John in Sophie's bed and orders him out of the room.  (Scs. 111-14.)

Back in London, Millais attends one of John's lectures at the Academy in the hope of glimpsing Effie.  (Sc. 115.)  John catches sight of Millais and rushes Effie out; Effie realizes that John knows of the affair.  (*Id.*)  Back in Denmark Hall, a doctor examines Effie and, rejecting John's diagnosis of madness, suggests that "childbirth has been known to work miracles."  (Sc. 116.)  As he leaves, the doctor mentions that Turner recently died in his sleep.  John is shocked.

He races to Turner's house, rushes past prostitutes, and burns Turner's drawings of female genitalia and other sexual images.  (Scs. 117-19.)  The scene flickers to Millais lighting an opium pipe to deal with his emotional pain.  (Sc. 120.)  From the opium pipe to the flame of an oil lamp, the scene jumps next to John's sleeping face.  Effie arrives and asks to sit with him; John insists that she return to her room.  She invokes the story of Abraham and Sarah and tells him that "I don't think I could go on living if I thought that I would never have a child."  (Sc. 122.)

At night, Mrs. Ruskin looks outside and sees Effie wandering in her night-dress through the gardens, carrying a lantern.  (Sc. 123.)  John also sees Effie outside, bright in the full moon.  (Sc. 125.)  Mrs. Ruskin applies a hot compress to John's chest as he coughs and wheezes.  (Sc. 126.)  Mrs. Ruskin confronts John about his marriage and John finally confesses to his mother that he has never lain with Effie.  Mrs. Ruskin is shocked, but tells John that he must take Effie's virginity so that Effie does not ruin him.  (*Id.*)

Back in Effie's room, Mrs. Ruskin encourages Effie to leave the house and never return: "Listen to the rain.  How gentle it is.  How reassuring.  Why don't you go now?  What are you waiting for?"  (Sc. 128.)  The script cuts forward to the foreshadowed scene from the beginning.  Effie wades out into the water beneath a full moon, her white dress floating around her like "a large white lily."  (*Id.*)  Elsewhere, Millais startles, sensing something wrong.  (Sc. 130.)  He races to the Ruskins' house, surges into the water, and recovers Effie's drowned body.  (Sc. 131.)  He lowers her to the ground and bursts out sobbing, but then saves her by breathing into her mouth.  (*Id.*)  John and Mrs. Ruskin appear.  Mrs. Ruskin orders the servants forcibly to remove Millais.  (*Id.*)  John carries Effie back into the house.  (*Id.*)  Soon after, John enters Effie's room and attempts to mount her, but is overwhelmed with a sense of compassion and withdraws.  (Sc. 136.)  Effie leaves the house and keeps on walking.  (*Id.*)

16

In the final scenes, Effie is shown pregnant, in a field, as she paints a portrait of Sophie and embraces Millais.  A different young girl, Rose, reads the opening lines from "The King of the Golden River" as John looks on.  End title cards reveal the rest of the story.

> D.     The *Trials* Script[7]

*Trials* opens with the clamor of a crowd at Oxford University excited to hear John lecture on Turner's works.  Effie, nineteen years old and attractive, is present with her father George.  Millais stands nearby with other artists and Mrs. Ruskin sits on stage.  While he speaks, John fixes on Effie.  After the lecture, Greenaway approaches John, thanks him for a kind review, and urges him to visit her studio to see a lovely girl.  While John then chats with Sir Reynolds and Turner, noting that Charles Dickens is present, Millais steps forward and is rebuffed by John, who does not know him.  John notices Effie mimicking the ladies in the crowd while drinking wine; suddenly, George takes Effie's glass away and sends her to the garden.  As Effie sits amidst the roses, John approaches and mentions that he once read to her when she was young.  He shows her how to draw and they discuss the roses.  When George interrupts, John insists that Effie and George join him in Kew Gardens.  On that tour—Mrs. Ruskin in tow—John sets off with Effie.  Discussing the orchids, they bond over ephemeral beauty.  John tells Effie he is pleased that she has not lost her youthful looks.  They discuss which orchid they would prefer to be and Effie tells John that he seems like a white orchid: tall, proud, and sophisticated.  They look forward to becoming good friends.  That night, John rests with his head in his mother's lap and, notwithstanding her caustic remarks, affirms that he hopes to marry Effie.

John visits Effie and her mother Anna in Scotland.  John guides Effie's hand as she paints and asks her to be his wife.  Effie tells Anna and John speaks with George.  While Anna fetches

---

[7] There are no scene numbers in *Trials*.

glasses for a toast, Effie introduces John to her baby sister, Isabella.  John reacts nervously to the baby.  One month later, Mrs. Ruskin tells John that she will not attend the wedding in Scotland and says that she will move out after the festivities, eliciting a protest from John.  She agrees to stay.  Effie discusses the marriage with Anna, who warns Effie that it will take hard work to win over Mrs. Ruskin.  The wedding scene reveals a happy couple and a first kiss.  The newlyweds board a steamship; flush with champagne, Effie is tipsy as she wanders the gangway.

The wedding night is pictured in detail.  Effie unlaces her boots.  John pours a hot bath. John slowly undresses Effie and washes her feet.  He unbuttons her dress and stares at her breasts, then turns and loosens her corset.  Effie trembles.  John's fingers are clumsy.  Effie gasps as she feels her bridle come undone.  Then John sees her underarm hair and is repulsed. His breathing grows labored.  He loosens his collar and fixes himself a drink, looking at Effie with a glazed expression.  Effie asks if something is wrong and John replies "no, it just wasn't what I expected."  He urges her to put on her night-gown and go to bed.  John changes into his night shirt and joins Effie in bed.  He lowers the covers, hitches up her gown, and mounts himself on top of her—but after he thrusts forward, his eyes glaze over, he lets out a long sigh, and then he rolls off onto his side.  John is upset and leaves for a walk.  Effie cries alone.

 Back at Denmark Hall, Effie meets a long line of servants.  Mrs. Ruskin notices that Effie has caught a chill and insists that Effie stay in her own room until she recovers.  Mrs. Ruskin then leads Effie on a tour of the building, noting that John's health conditions are the result of an early bout of scarlet fever.  Mrs. Ruskin emphasizes that *she* will treat John and then insists that Effie wear a formal dress, which John dislikes (this is clearly intentional).  Effie is crushed.  Looking out the window, she lights up when she sees two lovers.  She sneaks to John's study and puts her hands over his eyes; John, busy writing, is startled.  He asks if she still loves

him and she says yes.  She extracts a promise that he will take her with him to Venice, much to Mrs. Ruskin's chagrin.  Mrs. Ruskin makes it appear as though Effie stole the manuscript for John's forthcoming book.  John is furious and yells at Effie.  When Effie tells him that Mrs. Ruskin gave her the manuscript, John makes Effie swear on the bible—and then confronts his mother that night, stating that he believes Effie.  Mrs. Ruskin retorts that Effie must have taken the manuscript, since Effie is an untrustworthy and unreliable Gray.  John asks his mother to show more consideration for Effie "because she is my wife."  In a brief scene, John flips through the manuscript and sighs with relief when he finds what he is looking for: a drawing of a naked young girl.  He slips the drawing into a brown envelope.

The scene shifts to Venice.  A teacher introduces her young female students to Ruskin, who initiates a conversation with a girl named Sylvia and guides her hand as she draws.  Effie and John are shown as being affectionate in a gondola.  Effie shops for a glamorous dress that upsets John, who believes it exaggerates Effie's bosom.  At the party, an ambassador toasts to John for his successful book on Venice—a book that "brought life back into this dead city." Effie dances with a soldier, angering John.  As the night spirals out of control, the officer forces Effie to keep dancing and John grows angrier.  John finally reaches Effie and is almost killed when he tries to separate her from the solider.  Back in their room, he accuses her of instigating with the officer and tells her that he is "growing tired of her lies."  Effie cries.  That night, Effie is shown pleasuring herself in bed.  She reaches over to Ruskin, unbuttons his clothing, and starts to kiss him.  He wakes and violently pushes her away.

Back in London, seven years later, Effie is shown instructing a servant to tighten a corset so firmly that her breasts disappear.  Then she heads off to Lady Eastlake's house, where we learn she spends most of her time.  John visits Turner, who is occupied by prostitutes, and tries to

19

throw Turner's drawings of vaginas into a fireplace.  He rushes to Greenaway's studio, where a young girl named Lily is modeling.  John tells Greenaway that he took his mother, not Effie, to Venice.   John inhales Lily's ribbon and grows short of breath while reviewing nude drawings of Greenaway's young models.  In the next scene, John is shown dining at Denmark Hall with members of the pre-Raphaelite Brotherhood, including Millais.  He introduces Effie to the young artists and they discuss the goals of their artistic movement.  While John takes the group on a tour, Millais catches Effie watching him and smiles.  She looks away shyly.  Some period of time later, John and Effie visit Millais.  Millais is busy painting—his model is lying in the bath in a wedding dress and reading the newspaper—but shows John a work in progress about the famed Ophelia.  John insists that the Scottish Highlands would provide the perfect location for a background.  John, Effie, Millais, and Mrs. Ruskin all head north to Scotland.

The group arrives at a small, white-stone cottage.  A series of scenes reveals growing sexual tension between Millais and Effie.  John, Effie, and Millais row out into the loch and discuss philosophy.  John identifies his favored spot for the Ophelia landscape and recites the Ophelia soliloquy from memory.  That night, John and Millais bond over dinner.  John tells Millais that Effie is suffering from melancholia; Millais offers to take Effie with him while he paints and John approves.  In the next scene, Effie comes upon Millais painting as she rows across the loch.  They draw close, but only for a moment before Effie distances herself.  Effie remarks that she finds the painting very sad, since "death is the only way out for [Ophelia] . . . [Hamlet] does not love her."  Effie steps into the water and models Ophelia.  Millais finds this incredibly erotic, but then charges into the water to carry her out.  Effie is pleased by the thought that she resembled Ophelia and disrobes so that she can put on Millais' jacket.  John, examining the local birds through his binoculars, sees Effie disrobe.  Effie and Millais continue to flirt and,

eventually, they passionately kiss.  John sees it all through his binoculars.  As they lie in the grass, Effie says to Millais "John has never lain with me, not like this."  Millais is alarmed, but then says he is glad she told him.  They kiss again.

That night, John invites Millais to join him for a post-dinner nightcap.  John reveals that he is aware of the love between Effie and Millais.  Millais apologizes.  John orders Millais to leave at first light.  At breakfast, Effie receives the news mournfully.  She retreats to her room, where she cries while looking at a drawing of her and Millais in the grass.  John enters and notices that she has been crying.  He asks to see the drawing, but she refuses.

On the way back to Denmark Hall, John brings Effie to her family's house.  Effie is happy to see her family.  Anna asks Effie when she plans on having a child, but Effie avoids the question.  John reads Sophie a bedtime story.  Late that night, Effie discovers John in Sophie's bed and orders him out of the room.  She confronts him and says "you are a sick man, John Ruskin."  She announces that she is leaving him.  John responds by revealing that he knows her love for Millais and threatening to destroy Millais' reputation.

Back in London, Millais attends one of John's lectures at the Academy, fearing that John will ruin him.  These fears are ill-founded; John describes a Millais painting as "the great picture this year."  Millais encounters Effie in a corridor during John's lecture and urges her to run away with him.  She refuses.  Suddenly, John appears, grabs Effie, and marches off.  Effie begs John to release her from the marriage.  That night, John tells his mother that Effie and Millais are in love; Mrs. Ruskin tells him to keep Effie on a short leash.  In the next scene, Mrs. Ruskin intrudes as Effie frantically packs her suitcase.  Mrs. Ruskin seizes the suitcase and locks Effie's door.  Millais sees Effie trapped at the Ruskin's house and feels that something is "terribly wrong."  Mrs. Ruskin and John summon a doctor, who refuses to admit Effie to a hospital and states that

all she needs is a lot of rest.  Mrs. Ruskin tries to persuade Effie to voluntarily commit herself to a madhouse; Effie takes the suggestion under advisement.

As Effie sits in her room, Millais sneaks into the house.  From his point of view, we see John arrive home.  John finds Effie drunk, dancing around her room.  She tries to dance with John, but he throws her to the ground.  After John leaves, Millais slips into Effie's room.  They dance together and Effie tells him that she will be sent to a hospital on Monday.  Millais says that he will need her parents' permission to take her away, so he steals a letter Effie intended to send home and thereby obtains her parents' address.  John returns and discovers the letter that will hospitalize Effie.  He confronts his mother, who demands that he deflower Effie.  John refuses, but she insists.  The scene cuts to the Grays' house.  Millais promises George and Anna that he loves Effie and will marry her pending an annulment of her marriage to John.  The Grays agree to aid Millais and march out of their house.  The scene returns to Denmark Hall, where John advances on Effie and she fights back; then the script cuts to a train, where Effie lies fast asleep. Millais races along the train and awakens Effie, who disembarks and unites with her parents. The train whistles off into the distance and end title cards reveal the rest of the story.

## II.    Standard of Review

"In deciding a Rule 12(c) motion, we apply the same standard as that applicable to a motion under Rule 12(b)(6)."  *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).  Because this is a declaratory judgment action, the Court must determine whether Pomerance can "establish a set of facts that would preclude [Effie Film] from obtaining relief."  *Barber v. RLI Ins. Co.*, 06 Civ. 630, 2008 WL 5423106, at *1 (N.D.N.Y. Dec. 24, 2008).

To survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "In deciding a

motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept

all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the

plaintiff."  *Pyatt v. Raymond*, 10 Civ. 8764, 2011 WL 2078531, at *3 (S.D.N.Y. May 19, 2011)

*aff'd*, 462 F. App'x 22 (2d Cir. 2012), as amended (Feb. 9, 2012) (citations omitted).

      "In general, our review is limited to the facts as asserted within the four corners of the

complaint, the documents attached to the complaint as exhibits, and any documents incorporated

in the complaint by reference."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d

Cir. 2007) (citing *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002)).  Nonetheless

"in copyright infringement cases the works themselves supersede and control contrary

descriptions of them."  *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir. 1986).

      Although substantial similarity analysis often presents questions of fact, where the court

has before it "all that is necessary to make a comparison of the works in question," it may rule on

"substantial similarity as a matter of law on a Rule 12(b)(6) motion to dismiss."  *Peter F. Gaito*

*Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 65 (2d Cir. 2010).  It follows from this

rule that courts may also test substantial similarity on a Rule 12(c) motion.

## III.    Legal Standard

### A.    Copyright Law and Substantial Similarity Analysis

      To establish copyright infringement, "two elements must be proven: (1) ownership of a

valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist*

*Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  "Since direct evidence of

23

copying is rarely possible, copying is generally established by showing (a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works." *Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir. 1993) (citations omitted).

"The determination of the extent of similarity that will constitute a *substantial,* and hence infringing, similarity presents one of the most difficult questions in copyright law, and one that is the least susceptible of helpful generalizations." 4-13 *Nimmer on Copyright* § 13.03 (2009); *see also Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) ("The test for infringement of a copyright is of necessity vague."). Where the disputed works are entirely protectible, "[t]he standard test for substantial similarity between two items is whether an 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001) (quoting *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 100 (2d Cir. 1999)). However, when a work contains both protectible and unprotectible elements, the analysis is "more discerning." *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 141 (2d Cir. 1992). Specifically, "we must attempt to extract the unprotectible elements from our consideration and ask whether the *protectible elements, standing alone*, are substantially similar." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995) (citations omitted); *cf. Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir.) (L. Hand, J.) ("[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate.").

Further, "[i]n a copyright action . . . the similarity between two works must concern the expression of ideas, not the ideas themselves." *Peter F. Gaito*, 602 F.3d at 67 (citing *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90-91 (2d Cir. 1976); *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930)). Accordingly, where the holder of a copyright

24

alleges substantial similarity, the court must determine whether the alleged "similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking."  *Id.* (quoting *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134-35 (2d Cir. 2003)).  Judge Learned Hand offered the leading explanation of this rule:

> Upon any work, . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out.  The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

*Nichols*, 45 F.2d at 121; *see also Williams*, 84 F.3d at 587 ("[P]rotection covers the 'pattern' of the work . . . the sequence of events and the development of the interplay of characters" (quoting Zechariah Chafee, *Reflections on the Law of Copyright*, 45 Colum. L. Rev. 503, 513 (1945))); *Reyher*, 533 F.2d at 91 ("While the demarcation between idea and expression may not be susceptible to overly helpful generalization, it has been emphasized repeatedly that the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." (citations omitted)).

Thus, even though the "discerning" substantial similarity inquiry focuses on protectible elements in a work, courts "have disavowed any notion that 'we are required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.'"  *Peter F. Gaito*, 602 F.3d at 66 (quoting *Knitwaves*, 71 F.3d at 1003).  Rather, "we are principally guided by comparing the contested [work's] total concept and overall feel with that of the allegedly infringed work, as instructed by our good eyes and common sense . . . in the end, our inquiry necessarily focuses on whether the alleged infringer has misappropriated

the original way in which the author has selected, coordinated, and arranged the elements of his or her work." *Id.* (quotation marks and citations omitted). Courts "examine the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting" to test for substantial similarity. *Williams*, 84 F.3d at 588. "It is only where the points of dissimilarity exceed those that are similar and those similar are—when compared to the original work—of small import quantitatively or qualitatively that a finding of no infringement is appropriate." *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992) (citing 3 *Nimmer* § 13.03(B)(1)(a)); *see also Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382, 390 (S.D.N.Y. 2005) ("Critical to the issue of improper appropriation is whether the copied elements of the work are original and nontrivial."). That said, "[n]umerous differences tend to undercut substantial similarity." *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 913 (2d Cir. 1980) (citation omitted); *see also Warner Bros. Inc. v. Am. Broad. Companies, Inc.*, 720 F.2d 231, 241 (2d Cir. 1983); 3 *Nimmer* § 13.03(B) at 13–38.1 to 38.2 ("[A] defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's.").

Moreover, it is well established that "scènes à faire," which involve "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic" are "not copyrightable as a matter of law." *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980) (citations omitted); *see also id.* (noting that "it is virtually impossible to write about a particular historical era or fictional theme without employing certain 'stock' or standard literary devices"); *Walker*, 784 F.2d at 50 ("Elements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of

policemen in the South Bronx.  These similarities therefore are unprotectible as 'scenes a faire,'

that is, scenes that necessarily result from the choice of a setting or situation.").

### B.       Copyright Law and Works of Historical Fiction

Works of history and historical fiction present unique complexities for substantial

similarity analysis.  These complexities were highlighted in the Second Circuit's decision in

*Hoehling*, a case in which the author of a historical work examining the destruction of the

Hindenburg sued another author and a movie studio for infringing his copyright in their accounts

of that famous, doomed airship.  618 F.2d at 974-76.  The court crystallized precedent into the

rule that historical "fact" and "interpretation" are not protectible as a matter of law:

> A grant of copyright in a published work secures for its author a limited
> monopoly over the expression it contains.  The copyright provides a financial
> incentive to those who would add to the corpus of existing knowledge by creating
> original works.  Nevertheless, the protection afforded the copyright holder has
> never extended to history, be it documented fact or explanatory hypothesis.  The
> rationale for this doctrine is that the cause of knowledge is best served when
> history is the common property of all, and each generation remains free to draw
> upon the discoveries and insights of the past.  Accordingly, the scope of copyright
> in historical accounts is narrow indeed, embracing no more than the author's
> original expression of particular facts and theories already in the public domain.

*Id.* at 974.  The court added that "[historical] interpretations are not copyrightable as a matter of

law" because of the "'public benefit in encouraging the development of historical and

biographical works and their public distribution.'"  *Id.* at 978 (quoting *In Rosemont Enterprises,*

*Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966)).  Thus, "[t]o avoid a chilling

effect on authors who contemplate tackling an historical issue or event, broad latitude must be

granted to subsequent authors who make use of historical subject matter, including theories or

plots."  *Id.*  The court then held that "[i]n works devoted to historical subjects . . . a second

author may make significant use of prior work, so long as he does not bodily appropriate the expression of another." *Id.* at 980.

The Second Circuit's influential ruling in *Hoehling* has generated considerable commentary and criticism.  In *Nash v. CBS, Inc.*, Judge Easterbrook skeptically evaluated the economic incentives that result from *Hoehling*'s denial of copyright protection to historical facts and interpretation: "The authors in *Hoehling* and [another case] spent years tracking down leads. If all of their work, right down to their words, may be used without compensation, there will be too few original investigations, and facts will not be available on which to build."  899 F.2d 1537, 1542 (7th Cir. 1990).  Acknowledging that *Hoehling* correctly described the law, *id.*, Judge Easterbrook noted the complicated balance of *ex post* and *ex ante* incentives at stake:

> Every work uses scraps of thought from thousands of predecessors, far too many to compensate even if the legal system were frictionless, which it isn't.  Because any new work depends on others even if unconsciously, broad protection of intellectual property also creates a distinct possibility that the cost of litigation— old authors trying to get a "piece of the action" from current successes—will prevent or penalize the production of new works, even though the claims be rebuffed . . . Yet to deny authors all reward for the value their labors contribute to the works of others *also* will lead to inefficiently little writing, just as surely as excessively broad rights will do.  The prospect of reward is an important stimulus for thinking and writing, especially for [authors] who are full-time authors.

*Id.* at 1540-41 (internal citations omitted).

These economic arguments, in turn, relate to concerns about the freedom of information and expression essential to a democratic society engaged in debate over the meaning of its own past.  *See Harper & Row*, 471 U.S. at 558 ("[T]he Framers intended copyright itself to be the engine of free expression . . . copyright supplies the economic incentive to create and disseminate ideas").  As one commentator has explained:

> [T]he belief that "facts" cannot be monopolized draws strength from a parallel idea inherent in the first amendment.  As Judge Miner observed, "the freedom of

28

> access to facts and ideas is the history of democracy"; such freedom has promoted theories about freedom of speech, the marketplace of ideas, and invigorated democratic dialogue.  Although the relation between "expression" in copyright law and in the first amendment remains unclear, both doctrines accept that some information must remain freely accessible and usable by all.

Mary Sarah Bilder, *The Shrinking Back: The Law of Biography*, 43 Stan. L. Rev. 299, 315 (1991) (citations omitted).

The principal dispute over *Hoehling*, however, does not involve its implications for economic incentives or democratic dialogue.  Rather, *Hoehling* is criticized most frequently for its view of originality in the generation of historical facts and interpretations.  "The *sine qua non* of copyright is originality."  *Feist*, 499 U.S. at 345.  "Original, as the term is used in copyright, means only that the work was independently created by the author . . . and that it possesses at least some minimal degree of creativity."  *Id.*; *see also Sheldon*, 81 F.2d at 54 ("[I]f by some magic a man who had never known it were to compose anew Keats's Ode on a Grecian Urn, he would be an 'author,' and, if he copyrighted it, others might not copy that poem, though they might of course copy Keats's." (citations omitted)).  In *Harper & Row*, the Supreme Court acknowledged that while "[c]reation of a nonfiction work, even a compilation of pure fact, entails originality . . . in the realm of factual narrative, the law is currently unsettled regarding the ways in which uncopyrightable elements combine with the author's original contributions to form protected expression."  471 US at 548.  Several years later, in *Feist*, the Court offered a partial clarification.  Generally, "no one may claim originality as to facts" because facts are discovered rather than created; in other words, "facts do not owe their origin to an act of authorship."  499 U.S. at 347 (citations omitted).  "Factual compilations, on the other hand, may possess the requisite originality" because "[t]he compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be

29

used effectively by readers."  *Id.* at 348.  Such compilations are afforded "thin" copyright

protection.  *Id.* at 349.

Citing the Supreme Court's definition of originality, some commentators and scholars

have argued that *Hoehling* was wrongly decided because it misunderstood the nature of the

historical enterprise.  They contend that, whereas *Hoehling* assumes historical facts and

interpretations exist out in the world as objective and discoverable truths, history actually

involves a deeply subjective, contested, and imaginative process that requires the creation of

value-laden narratives purporting to represent a lost world.  *See, e.g.*, 2 *Patry on Copyright* §

3:63 ("Difficulties . . . have arisen in the area of history as the result of a poor first analysis . . .

Judge Hand's comments reflect a naïve and blinkered understanding of how history is written . . .

no narrative can be, as Hand suggested, a self-defining, self-selecting, self-ordering aggregation

of facts." (citations omitted)); *Id.* at § 4:5 ("Many historical events are presented in a narrative

form; the author selects particular events, creates a sequence for them, relates the events to each

other, and analyzes them . . . This process of construction involves the deliberate, 'imaginative'

creation of a coherence that exists only by virtue of the historian."); Susan Scafidi, *Digital

Property/Analog History*, 38 Loy. L.A. L. Rev. 245, 245 (2004) ("The use of the past in

American intellectual property jurisprudence . . . remains tethered to a view of history largely

associated with the nineteenth century."); Hartwell Harris Beall, *Can Anyone Own A Piece of the

Clock?: The Troublesome Application of Copyright Law to Works of Historical Fiction,

Interpretation, and Theory*, 42 Emory L.J. 253, 254 (1993) ("[T]he current application of

copyright laws to historical fiction, theories, and interpretations is unacceptable . . . the courts

seem too ready to overlook the biased and individualistic qualities of such interpretations, and, in

essence, the imaginative mortar of an historical theory or interpretation that holds the facts

together is treated as if it has merged with the facts themselves.").  The normative upshot of these critiques is clear: "Were the law to develop a more contemporary understanding of the field of history, it would arguably grant more equitable protection to historians and the authors of historical fiction."  Scafidi, *Digital Property*, at 247.

These critiques miss the mark by focusing on *Hoehling*'s reliance on a discredited account of the historical craft.  *Hoehling* is not an opinion about historians' lack of creativity. Indeed, the critique offered by Patry and sympathetic historians—insisting that historians put original work into producing facts and interpretations—essentially assumes a *labor-desert* theory of copyright law and argues that historians' are entitled to more robust property protection because they are performing the requisite creative labor.  *See* Jeanne C. Fromer, *Expressive Incentives in Intellectual Property*, 98 Va. L. Rev. 1745, 1753-56 (2012); *cf.* Wendy J. Gordon, *A Property Right in Self-Expression: Equality and Individualism in the Natural Law of Intellectual Property*, 102 Yale L.J. 1533 (1993).  But as its opening paragraph states, *Hoehling* is concerned primarily with the unique importance of maintaining a free flow of accessible historical information: "The rationale for this doctrine is that the cause of knowledge is best served when history is the common property of all, and each generation remains free to draw upon the discoveries and insights of the past."  618 F.2d at 974; *see also id.* at 978 ("To avoid a chilling effect on authors who contemplate tackling an historical issue or event, broad latitude must be granted to subsequent authors who make use of historical subject matter, including theories or plots.").  To achieve that end, *Hoehling* prioritizes an *instrumental* conception of copyright law and concludes that weak copyright protections will best facilitate the creation and dissemination of new historical knowledge.  *See id.* at 980 ("Knowledge is expanded as well by granting new authors of historical works a relatively free hand to build upon the work of their

31

predecessors."); *see also* William M. Landes & Richard A. Posner, *An Economic Analysis of Copyright Law*, 18 J. Legal Stud. 325 (1989) (instrumental views of intellectual property law).

Admittedly, *Nash* raised difficult questions about the merits of this incentive-based reasoning, which assumes that weak copyright protection for works of history will result in a greater total amount of knowledge production. *See* 899 F.2d at 1540-41; *see also Warner Bros. Inc. v. Am. Broad. Companies, Inc.*, 720 F.2d 231, 240 (2d Cir. 1983) ("It is a fundamental objective of the copyright law to foster creativity. However, that law has the capacity both to augment and diminish the prospects for creativity."). Further, this policy choice results in originality doctrine that has drifted away from the common sense of historians and a number of legal commentators. *See generally* 2 *Patry* § 4:5. Finally, the Supreme Court has warned that "[i]t is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest importance to the public", adding that "[s]uch a notion ignores the major premise of copyright and injures author and public alike." *Harper & Row*, 471 U.S. at 559.

These objections are surmountable. Creativity in history may approximate the creative process of generating works of fiction, but is arguably of a different sort by virtue of historians' goal of accurately representing past reality and the shared professional norms that discipline factual and interpretive adventurousness. *See* 1-2 *Nimmer* §2.11 (defending *Hoehling*'s approach to history); Richard J. Evans, *In Defense of History* (2000); Joyce Appleby et al., *Telling the Truth About History* (1994). These differences, coupled with the special role that historical knowledge plays in democratic deliberation, may justify different treatment of originality doctrine with respect to historical facts and interpretation. Further, incentive-based arguments may ultimately support *Hoehling*'s approach. For instance, given the growth of a large professoriate motivated—professionally, personally, and financially—to generate new

historical information even in the absence of strong copyright protections, weak protection may

suffice to maximize production, or at least to push it above an independently specified floor.  *Cf.*

Peter Novick, *That Noble Dream* (1998) (discussing the history and structure of the American

historical profession); John Higham, *History* (1965) (same).[8]

     In any event, to the extent that *Hoehling*'s policy analysis fails to account for important

considerations, and to the extent that the doctrinal expression of that policy view is undermined

by a more sophisticated account of the historical craft, only the Second Circuit may reconsider a

rule that binds this Court.  Indeed, notwithstanding scholarly critique, courts regularly rely on the

rule of law expressed in *Hoehling* to deny copyright protection to historical works—and to

construe the scope of "facts" and "interpretations" broadly in works that are historical in

character.  *See, e.g.*, *Narell v. Freeman*, 872 F.2d 907 (9th Cir. 1989); *Chase-Riboud v.*

*Dreamworks, Inc.*, 987 F. Supp. 1222 (C.D. Cal. 1997); *Alexander v. Haley*, 460 F. Supp. 40

(S.D.N.Y. 1978).  *But see Burgess v. Chase-Riboud*, 765 F. Supp. 233 (E.D. Pa. 1991).

     Recently, however, Judge Jones concluded in *Crane v. Poetic Products Ltd.* that

*Hoehling* was modified by *Feist*'s grant of thin protection to original compilations of facts:  "As

applied here, *Hoehling* and *Feist* result in the following conclusion: the theory that Pope John

Paul I was murdered and the facts surrounding his death are *not* protectable elements . . . [but the

work's] *expression* of that theory and surrounding facts—its selection, coordination, and

arrangement of its theories and facts—*is* protectable."  593 F. Supp. 2d 585, 590 (S.D.N.Y.

2009) *aff'd*, 351 F. App'x 516 (2d Cir. 2009); *see also Silverstein v. Penguin Putnam, Inc.*, 368

F.3d 77, 83 (2d Cir. 2004) ("If the selection process imbues a compilation with the requisite

creative spark, the compilation may be protected so long as there are indicia that principles of

---

[8] This is merely one among many competing economic incentives that may justify *Hoehling*.

selection (other than all-inclusiveness) have been employed.").  According to *Crane*, works of
history merit thin protection under *Hoehling* and *Feist* to the extent their interpretation is
expressed through an original selection, coordination, and arrangement of theories and facts.  *See*
1-2 *Nimmer* § 2.11 ("Courts sometimes regard a biography, history, or other factual account as a
judicious selection and arrangement of facts and, on the principle of the directory cases, prevent
unauthorized copying of that selection and arrangement." (citations omitted)).

A further twist applies to works of historical fiction.  When a book presents itself as an
"account of actual events," this representation "renders proof of infringement more difficult,
because copyright protection in this circuit does not extend to facts or to true events, even if they
are discovered through original research."  *Friedman v. ITC Int'l Television Corp.*, 644 F. Supp.
46, 48 (E.D.N.Y. 1986).  However, as Professor Nimmer explains, because "adding imagination
to fact can result in a protected work . . . a historical romance, albeit based on actual personages,
is still protected against copying of the fictitious devices added by the narrator."  1-2 *Nimmer* §
2.11 (citing *Burgess*, 765 F. Supp. at 233).  In other words, "[i]f and to the extent an otherwise
factual account contains fictional elements, or fictionalized versions of factual events, such will
be regarded as protectible by copyright."  *Id.*  On this view, works of historical fiction are a
hybrid genre: they do not present themselves as accounts of actual events and they partake to
some extent in the creativity ordinarily associated with pure fiction, but at the same time they
invariably draw on historical facts, take as their subject historical events and characters, and may
hover near the line between historical interpretation and creative fictionalization.

Courts must therefore take particular care in performing substantial similarity analysis
when one or both of the disputed works belongs to the genre of historical fiction.  In such cases,
copyright analysis requires an initial separation of protectible from unprotectible elements—in

34

other words, a separation out of the unprotectible historical facts and interpretations.  Once that separation is achieved to the greatest extent possible, courts must test for violations of the full copyright protection afforded to the remaining protectible elements.  In some cases, it may also be appropriate to test for violations of the "thin" copyright protection afforded to originality in the arrangement of unprotectible facts.  In this case, however, the two inquiries essentially collapse into a single analysis because the creative arrangement of unprotectible historical facts for purposes of "thin" protection is achieved through narrative devices (theme, characterization, pace) that span the entirety of the works and encompass the protectible fictionalizations.[9]

       Thus, the significance of the *Hoehling* rule here is that, to the extent that the disputed works are similar with respect to plot structure, individual scenes, settings, or features of individual characters that reflect historical facts or interpretations, those similarities do not count toward substantial similarity analysis.  Rather, substantial similarity must be shown through reference to the creative aspects of these works, such as fictional plot developments, scenes, settings, and character traits.  Substantial similarity can also be demonstrated through reference to creative devices that span the protectible and unprotectible elements of the works and transform the atomized facts into a meaningful, fictional story.  These devices include pace, theme, and narrative structure.  *See DiTocco v. Riordan*, 815 F. Supp. 2d 655, 667 (S.D.N.Y. 2011) *aff'd*, 11 Civ. 4438, 2012 WL 4016898 (2d Cir. Sept. 13, 2012) (citations omitted) ("In an analysis of literary works for substantial similarity, courts often consider such aspects as narrative structure, characters, themes, setting, plots and scenes, as well as total concept and overall feel.").  This requires a careful parsing of protectible fictionalizations from unprotectible

---

[9] The instant case is thus unlike classic "thin" protection cases that involve compilations such as phone books.  *See, e.g.*, *Key Publications, Inc. v. Chinatown Today Pub. Enterprises, Inc.*, 945 F.2d 509, 514 (2d Cir. 1991) (noting that thin protection is "not anorexic").

interpretations, since both involve the elaboration of meaning in a past that lacks an internal

narrative structure or self-determined meaning.  *But see* Francis Fukuyama, *The End of History*

*and the Last Man* (1992); G.W.F. Hegel, *The Philosophy of History* (1837).

<b>C.   Judicial Notice of Historical Facts and Interpretation</b>

It is well established that courts may take judicial notice of the works at issue in a

copyright case.  This case, however, presents the question whether the Court may take judicial

notice of the existence of certain historical facts and interpretations prerequisite to analysis of the

protectible and unprotectible elements of the disputed works on a Rule 12(c) motion.

Judicial notice of adjudicative facts is governed by Federal Rule of Evidence 201, which

provides that a "court may judicially notice a fact that is not subject to reasonable dispute

because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be

accurately and readily determined from sources whose accuracy cannot reasonably be

questioned."  Rule 201(b).  A court *may* take judicial notice "on its own," Rule 201(c)(1), and

*must* take judicial notice "if a party requests it and the court is supplied with the necessary

information," Rule 201(c)(2).  "The court may take judicial notice at any stage of the

proceeding," Rule 201(d), and "[o]n timely request, a party is entitled to be heard on the

propriety of taking judicial notice and the nature of the fact to be noticed," Rule 201(e).

Judge Weinstein has explained that "Rule 201(b) imposes no artificial limits on the range

of facts which may be noticed.  The broad scope of possible notice varies with the facts and

issues in each case and the evolving state of knowledge."  1-4 *Weinstein's Evidence Manual* §

4.02; *accord* 1 *Jones on Evidence* § 2:10 (7th ed.) ("Numerous cases can be found in which

courts judicially notice historical, scientific, geographical and topographical facts, phenomena of

nature, time, seasons and plants, customs and usages of businesses and professions, action of

36

government bodies and agencies, etc." (footnotes and citations omitted)).  Rule 201 thus permits

judicial notice of historical facts.  *See Weinstein's Federal Evidence*, §201.12[5] at 201-44

("Courts may take judicial notice of historical facts revealed in authoritative writings when there

is no dispute about the authenticity of the materials and judicial notice is limited to factual

matters that are incontrovertible."); *accord* 1 *Jones* § 2:51 ("Notice has been taken of historic

facts relating to religious history and practice, politics, international and foreign history, and a

variety of other subjects.").  Further, courts may "take judicial notice of facts that various

newspapers, magazines, and books were published solely as an indication of information in the

public realm at the time, not whether the contents of those articles were, in fact, true."  1-4

*Weinstein's Evidence Manual* § 4.02 (citations omitted); *accord Von Saher v. Norton Simon*

*Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) *cert. denied*, 131 S. Ct. 3055

(2011) ("[T]he Museum also moves for judicial notice of the fact that various newspapers,

magazines, and books have published information about the Cranachs.  Courts may take judicial

notice of publications introduced to 'indicate what was in the public realm at the time, not

whether the contents of those articles were in fact true.'" (citing *Premier Growth Fund v.*

*Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006))).

     In its leading case on judicial notice of historical facts, the Second Circuit acknowledged

the validity of noticing historical data while cautioning district courts against embracing disputed

interpretations about the meaning of historical events.  *See Oneida Indian Nation of New York v.*

*State of N.Y.*, 691 F.2d 1070, 1086 (2d Cir. 1982) ("[W]hen facts or opinions found in historical

materials or secondary sources are disputed, it is error to accept the data (however authentic) as

evidence."); *id.* at 1086-87 (noting that the lower court erred when it rejected without a hearing

the "claim that by Article IX, clause 1, the states delegated to the Continental Congress the

37

authority to enter into treaties of peace with the Indian nations which would protect them against extinguishment, without federal consent, of title to their lands within the boundaries of a state").

The list of facts judicially noticed in federal courts is long, diverse, educational, and, at times, improbable. Perhaps the most famous example of judicial notice is Justice Blackmun's opinion in *Flood v. Kuhn*, which traced the history of professional baseball and celebrated the "many names . . . that have sparked the diamond and its environs and that have provided tinder for recaptured thrills, for reminiscence and comparisons, and for conversation and anticipation in-season and off-season." 407 U.S. 258, 262 (1972). Following through on the promise implied by this opener, Justice Blackmun judicially noticed over seventy baseball players by name—an undertaking that prompted fierce horse-trading within the Court and suggested an expansive view of Rule 201's requirement of general knowledge or unquestioned accuracy. *See* Bob Woodward and Scott Armstrong, *The Brethren* 229 (1979) ("Calling Blackmun's chambers to request that some favorite player be included became a new game for the clerks."); *see also id.* ("Brennan was surprised."). Courts have also judicially noticed the traditional features of snowmen, *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 n.1 (2d Cir. 1982), the vulnerability of expensive cars to vandalism in New York City, *United States v. Mundy*, 806 F. Supp. 373, 377 (E.D.N.Y. 1992), holiday-induced delays in the federal mails, *Sinatra v. Heckler*, 566 F. Supp. 1354, 1356 (E.D.N.Y. 1983), the fact that "the most recent portions of Bible are not less than 1900 years old," *Truong v. Am. Bible Soc'y*, 367 F. Supp. 2d 525, 528 (S.D.N.Y. 2005) *aff'd sub nom. Troung v. Am. Bible Soc'y*, 171 F. App'x 898 (2d Cir. 2006), the fact that depositors receive monthly bank statements, *Kaggen v. Internal Revenue Service and United States*, 57 F.3d 163, 165 (2d Cir. 1995), the use of beepers by drug dealers, *United States v.*

*Ceballos*, 719 F. Supp. 119, 124 (E.D.N.Y. 1989), and the credit crisis, *King County, Wash. v.*

*IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 341 n.42 (S.D.N.Y. 2010).

   The list of judicially noticed historical facts is equally wide-ranging.  Relying on Rule

201, courts have judicially noticed facts contained in a comprehensive history of the construction

of Lincoln Center, *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. &*

*Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 (2d

Cir. 2002), Moody's historical stock prices as viewed on finance.yahoo.com,  *In re Moody's*

*Corp. Sec. Litig.*, 612 F. Supp. 2d 397, 401 n.3 (S.D.N.Y. 2009), the historical exclusion of racial

minorities from crafts, *United Steelworkers of America v. Weber*, 443 U.S. 193, 198 n.1 (1979),

the number of hijackings of American planes in the United States between September 6, 1968

and September 6, 1969, *Williams v. Transworld Airlines, Inc.*, 369 F. Supp. 797, 802 n.3

(S.D.N.Y. 1974), *aff'd sub nom. Williams v. Trans World Airlines*, 509 F.2d 942 (2d Cir. 1975),

the fact that the "armed forces of the United States did not enter Japan [after World War II] as

conquerors to levy and exact tribute or to ravish and lay waste the homeland of a defeated

people," *Japanese Gov't v. Commercial Cas. Ins. Co.*, 101 F. Supp. 243, 245 (S.D.N.Y. 1951),

the fact that an album "reached numbers 197 on the 'Billboard 200' and 32 on the 'Billboard R

& B/Hip Hop' Charts," *Straughter v. Raymond*, 08 Civ. 2170, 2011 WL 3651350, at *12 (C.D.

Cal. Aug. 19, 2011), the fact that "the years 1918-1919 were years of war," *Ransome Concrete*

*Mach. Co. v. Moody*, 282 F. 29, 33 (2d Cir. 1922), the Depression of 1920, *In re B. & R. Glove*

*Corp.*, 279 F. 372, 380 (2d Cir. 1922), and "the fact that Santa Claus is a legendary Christmas

figure" based on "Sint Nikolaas, a fourth century bishop of Myra, in Lycia, Asia Minor," who is

"considered as the patron saint of children and who is fabled as having provided three maidens

with dowry by throwing three purses of gold into their window," *Coston v. Prod. Movers*, 89 Civ. 4865, 1990 WL 56516, at *3 n.9 (E.D. Pa. May 2, 1990) (Santa Clause is not protectible).

In copyright cases, courts have recognized that they may judicially notice "the generic elements of creative works." *Davis v. Am. Broad. Companies, Inc.*, 10 Civ. 167, 2010 WL 2998476, at *5 (W.D. Mich. July 28, 2010). Thus, a court in this district has taken "judicial notice that members of the New York Police Department are often portrayed as Irish, smokers, drinkers, and third or fourth generation police officers." *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 438 (S.D.N.Y. 1985) *aff'd*, 784 F.2d 44 (2d Cir. 1986).

**D.     Analysis**[10]

**1.     Judicial Notice**

Pursuant to Rule 201, the Court takes judicial notice of certain historical facts pertaining to the Ruskin-Gray-Everett story that all three works—*Effie*, *King*, and *Trials*—portray in a partly fictionalized form.[11] The Court first notices facts relevant to the basic story structure and then notices a number of discrete facts relevant to its substantial similarity analysis.

Ruskin, Gray, Everett, and Margaret are all actual historical figures who lived in the mid-nineteenth century and were prominent in the English social and art scenes. It is a matter of indisputable historical fact that Gray first met Ruskin when she was twelve years old; Gray challenged Ruskin to write a fairy tale, which was eventually published under the title *The King*

---

[10] To distinguish actual historical figures from the literary-historical characters in the disputed works, the historical Effie Gray is hereafter referred to as "Gray", the historical John Ruskin is hereafter referred to as "Ruskin", the historical John Everett Millais is hereafter referred to as "Everett", and the historical Margaret Ruskin is hereafter referred to as "Margaret."

[11] The Court does not embrace wholesale the many facts urged by Plaintiff for judicial notice, since many of Plaintiff's exhibits consist of one or two pages copied from the middle of books without any context. In some cases, Plaintiff offers letters written by Ruskin or Gray without any information concerning the date, addressee, or context of the letter.

*of the Golden River*; Ruskin called on the Grays while visiting Scotland and fell in love with

Gray; Ruskin's parents did not attend the Scottish wedding; the Ruskin-Gray union led to an

unhappy marriage; Gray experienced a hostile relationship with Margaret; Ruskin's very close

attachment to his parents was a source of tension in the marriage; shortly before the marriage

ended, Gray told her parents of her unhappiness without indicating that she remained a virgin;

and the Ruskin-Gray marriage ended when Gray sought and received an annulment on the

ground of non-consummation.  *See generally* Robert Hewison, *Ruskin, John (1819-1900), Art

Critic and Social Critic*, OXFORD DICTIONARY OF NATIONAL BIOGRAPHY: ONLINE EDITION (Jan.

2006); *see also* Pl. Ex. 7 (unhappy marriage); Pl. Ex. 8 (hostility between Ruskin and Gray, as

well as hostility between Gray and Margaret); Pl. Ex. 9 (tension between Gray and Margaret); Pl.

Ex. 10 (deposition of doctors that Gray remained a virgin at the end of her marriage to Ruskin);

Pl. Ex. 17 (Gray describes the reasons offered by Ruskin for not wanting children).[12]

   With particular reference to the Gray-Ruskin sex life, however, "there is little that is

certain about the intimate details of Ruskin's marriage to Euphemia Chalmers Gray beyond the

fact that it was never consummated."  Hewison, *Ruskin*.  In a leading primary source, Gray

explained that "the reason [Ruskin] did not make me his Wife was because he was disgusted

with my person the first evening 10th April."  Pl. Ex. 17.  Interpreting relevant primary sources,

---

[12] Copies of John Ruskin's *The King of The Golden River* are available on Amazon.com; the
Kindle edition costs $0.00 (which Amazon notes is a $6.46 discount on the list price of $6.46).
*See* Amazon.com, *The King of the Golden River*, available at http://www.amazon.com/The-
King-Golden-River-ebook/dp/B0082ZEJKM/ref=sr_1_2?ie=UTF8&qid=1355183169&sr=8-
2&keywords=The+King+of+Golden+River (accessed December 10, 2012 at 6:45pm).

commentators have suggested that Ruskin was disgusted by Gray's pubic hair (Pl. Ex. 18) and

that Ruskin may have been repulsed by Gray's menstruation (Pl. Ex. 19).

The Court also takes judicial notice of the following facts: Ruskin publicly championed

the works of the pre-Raphaelite Brotherhood painters, including Everett; Everett and Ruskin

developed a close friendship built in part on similarities in their artistic vision; Gray posed as the

model for a Jacobite wife in an Everett painting entitled *The Order of Release*; Everett, Ruskin,

and Gray traveled to Scotland for four months in 1853, during which time Everett painted a local

waterfall as the background to a portrait of Ruskin commissioned by Ruskin's father; while in

Scotland, Ruskin delivered a series of lectures at Edinburgh, and Everett and Gray fell in love;

and Everett later completed Ruskin's face and figure in the portrait after returning to London.

*See generally* Hewison, *Ruskin*; Malcolm Warner, *Millais, Sir John Everett, first baronet (1829-*

*1896), painter*, OXFORD DICTIONARY OF NATIONAL BIOGRAPHY: ONLINE EDITION (May 2006);

*see also, e.g.*, Pl. Ex. 8 (trip to Scotland); Pl. Ex. 12 (Ruskin's interest in pre-Raphaelite

Brotherhood art and growing friendship between Everett and Ruskin); Pl. Ex. 14 (Everett's

portrait of Ruskin and emerging feelings for Gray).

Finally, the Court also takes judicial notice of the following historical facts:

- Ruskin developed a close relationship with J.M.W. Turner.  *See* Hewson, *Ruskin*.

- When Gray and Ruskin first arrived at Denmark Hall after their honeymoon, "all
  the servants were lined up at the door to meet them . . . ."  Pl. Ex. 24.

- Ruskin visited Venice several times and developed an interest in Venetian
  architecture.  Gray accompanied Ruskin on two trips to Venice during their
  marriage, at which point he had begun to draft *The Stones of Venice*.  While in
  Venice in 1851, Gray participated in the social life centered around the Austrian

military authorities.  *See* Hewson, *Ruskin*.  One scholar reports that Gray was happy in Venice and interprets this feeling to be the result of her escape from the frustrations attendant to living with the Ruskins.  Pl. Ex. 33.

- Everett painted *Ophelia* near Surrey and added the figure of Ophelia in his studio by having a model, Elizabeth Siddall, pose in a bathtub.  *See* Warner, *Millais*.

- Gray wrote to Ruskin that "in order to compromise the matter with you I shall promise never to wear an excessively Pink Bonnet which can be seen all over the Exhibition although I suppose you have not particular objection to one of a paler hue.  Pink is a very favourite colour of mine but I will subdue the shade out of respect to your superior discernment in these matters . . . ."  *See* Pl. Ex. 15.  One historian notes in a similar vein that "[n]othing [Gray] did was right: she dressed too loudly and was too social, or was not social enough."  Pl. Ex. 21; *see also* Pl. Ex. 22 (Ruskin wrote that Gray should dress "much more quietly" at parties).

- A point of hostility between Gray and Margaret concerned treatment of Ruskin's recurrent colds.  *See* Pl. Ex. 9.  Scholars have noted the intense relationship between Margaret and Ruskin.  *See* Hewson, *Ruskin*; Pl. Ex. 40; Pl. Ex. 41.

- Gray's father suggested to Ruskin's father that the growing estrangement between Gray and the Ruskins was attributable in part to living in the Ruskin's house (Pl. Ex. 31); Ruskin's father argued in response that such inappropriate desires for independence were probably at the root of Gray's unhappiness (Pl. Ex. 32).

- While in Edinburgh, Gray threatened to invoke legal protections to leave Ruskin, prompting him to threaten her with loss of reputation.  *See* Pl. Ex. 7.

43

- Around 1850, Ruskin and Gray developed a social relationship with Sir Charles Eastlake, president of the Royal Academy, and his wife, Elizabeth.  Lady Eastlake became an ally of Gray in the Victorian social world and, after the annulment, publicly supported Gray's cause.  *See* Hewson, *Ruskin*; *see also* Pl. Ex. 8.

- "Ruskin in later life was attracted to very young girls, falling in love at the age of forty with a ten-year old . . . ."  Pl. Ex. 18.

As a matter of copyright law, historical facts and interpretations are not protectible.  *See Hoehling*, 618 F.2d at 974.  Neither *Effie* nor the Pomerance screenplays present themselves as works of actual history, but each draws on history and discusses historical figures.  Accordingly, to the extent that individual elements of *Effie* and either of the Pomerance works are substantially similar, but are based on history, similarity analysis is modified in light of *Hoehling* and *Feist*.

### 2.        Substantial Similarity:  *Effie* Compared to *King*[13]

*Effie* and *King* are based on the same historical figures, cover the same period of time, and focus on the same set of relationships.  Unsurprisingly, the scripts are therefore similar in a number of respects, particularly with respect to basic plot structure, the identities of the main characters, and a number of scenes.  These similarities in unprotectible elements of both works do not count toward a finding of substantial similarity.  The Court therefore separates out these unprotectible elements and focuses on the protectible remainder, examining with particular care

---

[13] For purposes of this motion, Plaintiff concedes and the Court assumes that Plaintiff had access to *King*.  Thus, the only dispute concerns substantial similarity.  Pomerance has submitted several comparison documents that purport to identify substantial similarities between *Effie* and *King*.  This comparison, however, is poorly organized and refers to the pre-filming version of the *Effie* screenplay.  Rather than undertake an exhaustive, point-by-point discussion of that largely unhelpful and inapposite comparison, the Court considers examples from the comparison where useful and otherwise relies upon its own assessment of the disputed works.

44

a number of central scenes, pace and narrative structure, themes and central literary references, and characterization. Taken together and examined alongside overall concept and feel, these factors do not support a finding that *Effie* is substantially similar to *King*.

### a. Plot and Scenes

*Effie* and *King* both depict the same arc of events, from the first meeting of Effie and John through their unhappy marriage, Effie's affair with Millais, and an annulment on the basis of non-consummation. In both works, Effie is from Scotland, John is from England, John's family lives in England, the couple is married in Scotland, the couple vacations in Venice, John is prominent in the local art scene, Effie is unhappy and feels trapped in Denmark Hall, Effie fights with Mrs. Ruskin, Effie and Millais fall in love while staying at a cabin in Scotland, and Effie and Millais end up together. These similarities, just to name a few echoes in the works' basic plot structures, are drawn from historical facts that are not protectible under copyright law.

Many other similarities are also grounded in historical fact. These include a friendship between John and Turner, the description of John's aesthetic theory and his support for a movement called the pre-Raphaelite Brotherhood whose members included Millais, the social relationship between John and Millais, the fact that a male doctor examined Effie for signs of pregnancy, Effie's involvement with the Austrian social scene during her time in Venice, John's recurrent cough and his mother's homeopathic remedies, Millais painting a portrait of John in Scotland, Millais painting a work that takes Ophelia as its subject, and a persistent hostility between Effie and Mrs. Ruskin during Effie's time at Denmark Hall.

The presence of these similarities in plot and plot structure does not support a finding of infringement because these plot elements map onto historical facts. Only where the works depart from actual history, or employ such creative devices as theme and pacing to infuse the work with

45

different literary import, is copyright protection implicated. *Effie* and *King* each contain a significant share of such fictionalizations. Further, in some cases, one work fictionalizes while the other remains close to the historical record. For example, whereas John and Millais are friends throughout *Effie*, in *King* their relationship begins late in the script. Likewise, Turner is a marginal figure in *Effie*, but plays an important role in *King* by revealing John's view of sexuality. These fictionalizations, however, are in most cases markedly different—either obviously so or with respect to their significance for development of theme, pace, and characterization. Thus, even where the works share common ideas—for instance, Effie feeling trapped in Denmark Hall or John being repulsed by Effie's body—the expression of those ideas is not similar.

The parties appear to agree that five of the most significant fictionalized scenes for purposes of copyright analysis include: (1) the first meeting between John and Effie; (2) the first time Effie and John attempt intimacy; (3) Effie being rebuked for wearing an inappropriate dress; (4) the trip to Venice; and (5) John's discovery of the burgeoning affair between Effie and Millais while in Scotland. On careful examination, none of these scenes is substantially similar across the two works, particularly when historical facts are filtered out.

The "first meeting" scenes, which mostly lack a historical basis, are presented very differently in the two works.[14] In *Effie*, the meeting is brief and introduces an intellectual connection built on themes of perfection, purity, and escape. John and Effie contemplate Gian Lorenzo Bernini's famous sculpture, "Apollo and Daphne," with John cast in a pedagogic role

---

[14] To the extent that the scenes might be viewed as similar because of the age difference between John and Effie, it is a historical fact that they met when she was only twelve years old (and he was older than she was at the time).

and Effie cast as a charming, sweet, and innocent young girl.  In *King*, John notices Effie dancing outside and then reads her a fairytale while caressing her hair.[15]  While John is cast in the dominant role in both scenes, the differences in setting, theme, physicality, and dialogue significantly outstrip the comparatively minimal similarities.

 The "wedding night" scenes, which also lack a firm historical basis, are dramatically different.[16]  In *Effie*, the scene is brief and startling.  John tells Effie that she is "perfect" while she stands in her nightgown; seconds later, Effie is crying in bed.  *King*, in stark contrast, presents a detailed and highly fictionalized account of the night's events.  Separate from the fact that both works depict the couple's first night together as traumatic—a similarity grounded in the historical record and an idea too general to constitute infringement—the scenes are not similar.

The "extravagant dress" scenes draw closer to the historical record, which discloses through primary source documents that John was frustrated with Effie's allegedly flashy and extravagant taste in clothing—specifically including pink clothing.  In *Effie*, this issue arises twice: first in Effie's promise not to "wear anything too excessively yellow" and then again when the Ruskins erupt at Effie for selecting a bright pink dress for dinner at the Academy.  In *King*, the issue also arises twice: first when Mrs. Ruskin forces Effie into a formal dress that John despises and then again when Effie purchases a glamorous dress in Venice that leads John to view her as a whore.  The similarities are not substantial.  Whereas *Effie* tracks the historical record in focusing on bright colors, thus reflecting John's delicate sensitivities and also his

---

[15] Although it is a historical fact that John created a fairytale for Effie called "The King of Golden River," he did so after Effie challenged him to write a story.  Pomerance presents the scene in a creative and fictionalized manner.

[16] The only historical guidance comes from a letter in which Gray reported that Ruskin was "disgusted with my person."  Historians disagree over the meaning of this letter.

family's close attention to social convention, *King* suggests that John grows angry because his young and innocent wife has been transformed into a mature and sexualized object.[17]  Further, the scenes differ in their setting, origin, and significance to character development.

The "Venice trip" scenes do not support substantial similarity.  In *Effie*, John spends his time as a scholarly recluse while Effie explores the city.  He is uninterested in Effie's adventures, though he impliedly disapproves of what he perceives to be her hedonic ways.  Effie grows close to Raphael, is traumatized by his advance, and starts to suffer hallucinations.  In *King*, John and Effie happily explore the city together, John metaphorically seeks to curtail Effie's sexuality when he tightens her corset to hide her breasts, and then John is almost killed when he tries to separate Effie from an Austrian soldier.  The works' treatments of their time in Venice, as well as the works' use of that trip for character and plot development, are very different.

Perhaps the works' most striking departure from the historical record is the fact that John discovers the Effie-Millais affair while in Scotland, an event unsupported (though not flatly contradicted) by the historical record.  These scenes reflect creative speculation about what might have occurred—and therefore do not fall under the *Hoehling* rule.  Nonetheless, the similarity in the idea of John's discovering the affair is not matched in the expression of that idea, which is entirely different across the two works.  In *Effie*, the affair develops over twenty scenes, most of which occur while John is off in Edinburgh.  The growing feelings are presented as a mutual affection.  Effie and Millais are not intimate, and John discovers the affair by overhearing them late at night.  John does not confront Millais, but rather implies to Effie that he is aware of her feelings and insists that they return to London.  In *King*, the affair blossoms over

---

[17] This pattern in *King* appears to be confirmed when, back in London, John purchases a dress for Effie on her birthday that makes her look like a child and completely desexualizes her.

just a few scenes.  Effie makes the opening sexual advance toward Millais, who initially responds by objecting.  John, who is bird-watching by the loch, sees them kiss.  John then confronts Millais, not Effie, and expressly states that he knows of the indiscretion.  Millais is sent to London while John and Effie leave for the Gray residence in Scotland.  Although the plot twist of John's discovering the Effie-Millais affair in Scotland is creative, this general similarity at the level of plot is riddled with so many differences in expression and execution that it cannot be deemed substantial.[18]

The two works also contain a number of unprotectible scènes à faire, including shots of Victorian-era gardens, the winding and checking of a Victorian-style gold pocket watch, a manor staffed by servants, panoramas of the Scottish countryside, and views of the Venetian cultural scene during the occupation of that city by Austrian officials.

### b.  Narrative Structure and Pace

*Effie* and *King* both open with foreshadowed scenes and then jump to the first time Effie and John meet.  This initial similarity is striking, but the works' pace and narrative structure soon diverge in important respects.  *Effie* races toward a marriage scene, pausing only for brief flashes of dialogue and character development.  *King* moves slowly and deliberately through John's lecture at the Academy, a courtship in three different gardens (the Academy, Kew Gardens, and the Gray's house), an introduction to most of the characters, an engagement marred by John's refusal to kiss Effie, a pre-festivities meeting of two families, and only then a wedding scene.  After the nuptials, both films then progress toward painful depictions of doomed intimacy—but while *King* moves almost directly to the bedroom, *Effie* pauses for a tour of Denmark Hall, a

---

[18] The portrayal of the trip to Scotland in *King* is fictionalized—and different from *Effie*—in a number of other respects.  For example, historically, Margaret did not accompany the group to Scotland and Everett painted *Ophelia* in Surrey rather than Scotland.

deeply uncomfortable dinner, and a preview of life with the Ruskins. Then *Effie* leaps across the unviewable to a scene of Effie crying, while *King* offers a detailed, frame-by-frame guide to the slow-motion train wreck that is their first night as husband and wife.

As the marriage sours, *King* devotes a few scenes to intrigue at Denmark Hall before stepping across the Channel (and a substantial chunk of Europe) to arrive in Venice. *Effie*, in contrast, lingers in England for a confrontation over Effie's sartorial choices, a dinner at the Academy, an introduction to Millais and Lady Eastlake, and the drama that accompanies a subsequent visit by the Eastlakes. Only then does *Effie* join *King* in Venice. The scripts draw closer in pace and structure while in Venice; in both works, the pace builds at a rapid clip and the trip to Venice ends with a disaster that implicates Effie's sexuality and John's temper. But this convergence is short-lived. Whereas *Effie* returns to England for a few scenes before heading north to Scotland, *King* devotes almost two dozen scenes to Millais meeting John, fights in the Ruskin household, and visits by John to Turner and Greenaway. In Scotland, in contrast, *Effie* devotes over twenty scenes to the growing romance between Effie and Millais, matched by only five scenes in *King*. *Effie* then moves back to Denmark Hall, whereas *King* stops at the Grays' home in Scotland. The pace of the two films draws closer together as they race toward dramatic conclusions, though by this point the overall differences in pace and structure have so shaped the two works that these similarities are not "substantial."

### c. Themes

The works' themes are not substantially similar. Whereas *Effie* focuses on themes of perfection and escape that it channels through Ovid, *King* relies on a Shakespearean grammar keyed to *Hamlet* and also introduces strong notes of pedophilia and oedipal desire.

*Effie*'s dominant themes include a woman's search for freedom and escape in Victorian England, the role that women can play in providing assistance to each other in a male-dominated society, and the sinister aspects of a fixation on perfection and purity—particularly when those virtues are favored to the exclusion of mature sexuality and an enjoyment of worldly pleasures.

Significantly, *Effie* introduces and develops its overarching themes of perfection and escape through the metaphor of Apollo and Daphne, a reference to Ovid's *Metamorphoses* laden with mythological and literary significance:

> She in her speed does all her safety lay;
> And he with double speed pursues the prey;
> O'er-runs her at the sitting turn, and licks
> His chaps in vain, and blows upon the flix:
> She scapes, and for the neighb'ring covert strives,
> And gaining shelter, doubts if yet she lives:
> If little things with great we may compare,
> Such was the God, and such the flying fair,
> She urg'd by fear, her feet did swiftly move,
> But he more swiftly, who was urg'd by love.
> He gathers ground upon her in the chace:
> Now breathes upon her hair, with nearer pace;
> And just is fast'ning on the wish'd embrace.
> The nymph grew pale, and in a mortal fright,
> Spent with the labour of so long a flight;
> And now despairing, cast a mournful look
> Upon the streams of her paternal brook;
> Oh help, she cry'd, in this extreamest need!
> If water Gods are deities indeed:
> Gape Earth, and this unhappy wretch intomb;
> Or change my form, whence all my sorrows come.
> Scarce had she finish'd, when her feet she found
> Benumb'd with cold, and fasten'd to the ground:
> A filmy rind about her body grows;
> Her hair to leaves, her arms extend to boughs:
> The nymph is all into a lawrel gone;
> The smoothness of her skin remains alone.

*Metamorphoses by Ovid*, The Internet Classics Archive (MIT), *available at*

http://classics.mit.edu/Ovid/metam.1.first.html (accessed December 7, 2012 at 1:29pm).  In the

opening scene, John explains to Effie: "She is the nymph, Daphne.  He is the god Apollo.  He wants her with an overwhelming desire.  He wants to possess her purity.  But she does not want him and turns herself into a laurel tree.  In order to escape . . . Nymphs are very clever."  (Sc. 2.)  This metaphor directly structures key scenes in the *Effie* screenplay, notably including the couple's trip to Venice, where John does not recognize a daguerreotype of Bernini's famous sculpture and Effie hallucinates about tree bark on her skin (Daphne's transformation).  The introductory reference to Ovid also marks John's obsession with a particular conception of female perfection and purity:  he idealizes a young, beautiful nymph struck by Cupid with an arrow that destroys her romantic and sexual desires so entirely that she can resist even a love-struck god.  When John relates Ovid's tale, Effie immediately fears that she must fall short by comparison: "But nymphs are perfect.  I am not."  (Sc. 2.)

This dynamic of an older man seeking to possess a young girl's purity sets the plot in motion.  John is traumatized by his growing realization that aesthetic perfection sits awkwardly with imperfect human needs and bodies, as well as a terror that Effie is not his idealized Daphne—judgments he extends both to Effie and to the City of Venice.  Indeed, by the time John arrives in Venice, he no longer recalls relating to Effie the story of Daphne and Apollo.  Meanwhile, Effie discovers that she does not want to be Daphne but, ironically, has put herself at risk of being transformed into the sexless nymph by marrying John.  Bernini captured this tension by presenting Daphne mid-transformation, half nymph and half laurel.  Rafael, the only serious interlocutor in Venice, draws out this tension in both of the main characters.  John insists to Rafael in a heated dialogue that Effie "has plenty of faults"—revealing that, whereas John insists architecture and nature are rendered *more* beautiful by faults, the famous critic is far more conflicted about the role of flaws in the female body and "innocent" female character.  Just a few

scenes later, Effie's traumatic (yet arousing) sexual encounter with Rafael proves, once and for all, that she is no sexless Daphne—a truth later rendered with even greater force by her budding romance with Millais.

Of course, Effie does not live in Ovid's closed universe.  Whereas Daphne could find no escape in this world, the barriers to Effie's freedom—Victorian social and legal conventions governing marriage—are surmountable, with a significant and well-timed intervention by Lady Eastlake.  This connects to the related theme about mechanisms of female empowerment in Victorian England, which ironically hinge on a male doctor determining that Effie remains a virgin (in other words, that she in some respects has remained Daphne), a male attorney helping her pull the relevant legal strings, and a powerful female figure championing her cause.

*King* roughly echoes a theme of escape and feminine innocence, but manifests that theme through the metaphorical vocabulary afforded by the Ophelia of Shakespeare's *Hamlet*.  That choice leads to critical differences at the level of subthemes and narrative devices.

The main similarity is that Ophelia, like Daphne, embodies an enduring tension between male perceptions of uncontrolled female sexuality and innocent female virtue—witnessed poignantly in the famed "nunnery scene" from *Hamlet*, but also in Hamlet's disjointed treatment of Ophelia throughout the Bard's famous play (analogous in some respects to John's waffling between compassion and spite in *King*).  But that tension in male perception of female sexuality is expressed differently in Shakespeare than in Ovid.  Unlike Daphne, who is rendered incapable of love by Cupid and whose transformation into a tree is a self-chosen means of escape, Ophelia is driven mad by a whirlwind of tragic circumstances and by her lover Hamlet's alternating professions of love and disdain.  Whereas Daphne is arguably a tragic heroine, Ophelia is merely tragic—frail, innocent, and unable to cope with unfolding trauma.  Even as Ophelia retains

53

associations of incorruption and virtue in her decent toward insanity, a contrast most powerfully

manifested in bawdy songs of death and sex, her tragic end hints of suicide:

> There is a willow grows aslant a brook
> That shows his hoar leaves in the glassy stream.
> There with fantastic garlands did she come
> Of crowflowers, nettles, daisies, and long purples,
> That liberal shepherds give a grosser name,
> But our cold maids do "dead men's fingers" call them.
> There, on the pendant boughs her coronet weeds
> Clambering to hang, an envious sliver broke,
> When down her weedy trophies and herself
> Fell in the weeping brook. Her clothes spread wide,
> And mermaid-like a while they bore her up,
> Which time she chanted snatches of old lauds
> As one incapable of her own distress,
> Or like a creature native and indued
> Unto that element. But long it could not be
> Till that her garments, heavy with their drink,
> Pulled the poor wretch from her melodious lay
> To muddy death.

William Shakespeare, *Hamlet*, Act IV, Sc. VII.

*King* interprets Ophelia's death as a suicide and links it to Ophelia's belief that Hamlet

did not love her.  As Effie explains to Millais, "death is the only way out for [Ophelia] . . . he

does not love her."  Millais objects that Ophelia could escape, but Effie replies "no, that is

impossible."  Moments later, Effie clothes herself in Ophelia's dress and appears to Millais as a

model of the doomed character.  By analogy, there is no escape for Effie from her loveless and

sexless marriage—at least, no escape other than death.  Unable to cope with John's disorienting

mix of compassion and hostility, she is pushed inevitably toward suicide.  That pivotal moment

opens the screenplay and triggers its denouement.  The Ophelia analogy runs throughout *King*:

Millais is painting a portrait of Ophelia, Effie models Ophelia, John recites the famous account

of Ophelia's end, and Effie is closely connected to flowers throughout the script and is described

as a "large white lily" as she sinks into the water.  Yet Effie is not Ophelia.  She remains close to

her father and ultimately escapes John's twisted vision through a mutual love with Millais in

which she can express both her personality and her sexuality.  Unlike *Effie*, perfection drops out

of the thematic register, and the focus on escape is tinted with overtones of suicide and then a

sexually healthy love for Millais.  The Effie character thus channels very different themes.

In addition to these *Hamlet*-based themes and motifs, *King* departs from *Effie* even

more strongly in adopting an oedipal view of John's relationship with his mother, hinting that

John had pedophilic impulses, and focusing expressly on John's revulsion when faced with the

adult female form.  The latter themes are expressed most powerfully in the contrast wrought by

John's visits with Turner and Greenaway.  Whereas Turner's studio is bursting with prostitutes

and roughly sketched vaginas, and sends John into a furious panic, Greenaway's innocent and

pure ten-year-old model appears to soothe John's nerves even as the scene hints of arousal.

To describe the works' themes is to reveal their stark differences.  An evaluation of the

works' themes weighs strongly against a finding of substantial similarity.

### d. Characters

"The bar for substantial similarity in a character is set quite high."  *Sheldon Abend*

*Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010).  This is particularly

true where the characters in a disputed work are based on actual historical figures, since the

prohibition on copyrighting historical facts necessarily extends to control over interpretations of

a historical actor.  Even though *King* and *Effie* rely upon the same historical figures for their

main characters, they interpret these characters in strikingly different ways.

To take just one example, *Effie* in many respects casts John in the mold of a traditional

Victorian male.  Like his parents, he is a cold, self-absorbed, and snobby elitist.  He is indifferent

to Effie's suffering when her mother miscarries and takes great pride in the massive portrait of him that Millais prepares for Denmark Hall. He pursues artistic beauty, but cannot handle human frailty or the human body. He is attracted to Effie as the embodiment of aesthetic ideals, not as a person with emotional or sexual needs. Whenever he pronounces her "perfect," he does so in a context that depicts her as a work of art. Thus, on the train to London after their marriage, John rearranges Effie's hair, sits back, and deems her "perfect." (Sc. 15.) So too on their wedding night: Effie appears in her nightgown, leading John to describe her "statue-like figure" as "perfect." He never attempts to force himself on Effie. And when John learns of the affair with Millais, he coldly charges Effie with snaring both men with her feminine wiles.

*King*, in contrast, presents a very different interpretation of John. He is presented as a charismatic celebrity capable of inspiring erotic feelings in women. He is highly social, but contemptuous toward unknown artists (initially including Millais). He actively pursues Effie and, at times, shows compassion. The difference is particularly stark in Venice, where John kisses Effie, accompanies her to balls, and ultimately intervenes to protect her from the Austrian solider. In Scotland, he orders Millais to leave at gunpoint after discovering the affair. Late in the screenplay, he very nearly forces himself violently upon Effie. At points, he appears to be emotionally involved with his mother and sexually (or at least intellectually) aroused by young girls. The John portrayed in *King* is not substantially similar to the John in *Effie*.

These differences are even more striking for secondary characters. Whereas "George" and "Anna" are servants in *Effie*, they are Effie's parents in *King*. Millais is a close friend and ally of John throughout *Effie*, whereas Millais spends most of *King* seeking an opportunity to first present his works to John. Turner plays a trivial role in *Effie*, but is invoked at a critical

moment in John's character development in *King*.  And, whereas Lady Eastlake is a significant figure in *Effie*, she does not appear at all in *King*.

### e.  Overall Concept and Feel

Substantial similarity analysis is "principally guided" by the "total concept and overall feel" of the works.  *Peter F. Gaito*, 602 F.3d at 66.  Taken together, the differences discussed above in reference to structure, scenes, plot, pace, theme, and characters defeat any claim that *Effie* is substantially similar to *King*.  Setting the two works side-by-side, the reader does not develop a sense that the author of *Effie* copied any significant amount of protectible material from *King*.  To the contrary, the works are different in many critical respects and the occasional similarities are scattered and incidental rather than "substantial."

### 3.        Substantial Similarity:  *Effie* Compared to *Trials*[19]

Just like *King* and *Effie*, *Trials* and *Effie* are based on the same historical figures, cover the same period of time, and focus on the same set of relationships.  Unsurprisingly, the scripts are therefore similar in a number of respects.  These similarities in unprotectible elements of both works do not count toward a finding of substantial similarity.  The Court therefore separates out these unprotectible elements and focuses on the protectible remainder.

Taken together and examined alongside overall concept and feel, these factors do not support a finding that *Effie* is substantially similar to *Trials*.  Indeed, the similarities between *Trials* and *Effie* are even fewer in number and importance than the similarities between *King* and

---

[19] For purposes of this motion, Plaintiff concedes and the Court assumes that Plaintiff had access to *Trials*.  Thus, the only dispute concerns substantial similarity.  Pomerance has submitted several comparison documents that purport to identify substantial similarities between *Effie* and *Trials*.  This comparison, however, is poorly organized and refers to the pre-filming version of the *Effie* screenplay.  Rather than undertake an exhaustive, point-by-point discussion of that largely unhelpful and inapposite comparison, the Court considers examples from the comparison where useful and otherwise relies upon its own assessment of the disputed works.

*Effie*.  Because *Trials* and *King* are also very similar, the Court largely adopts its analysis of *King*

and in this section indicates only similarity issues distinct from those raised by *King*.

### a.  Narrative Structure and Pace

The structure and pace of *Effie* and *Trials* differ in important respects, only a few of

which are noted here.  First, *Trials* departs from *Effie*'s narrative structure by skipping past the

first time that John and Effie meet.  Instead, John approaches Effie after his talk at Oxford and

reminds Effie of an earlier meeting in which he read to her as a child.  Second, *Trials* introduces

many more scenes than *Effie* in which John is shown interacting with people other than Effie and

Mrs. Ruskin, thereby modifying character development.  Likewise, *Trials* independently portrays

Millais on a number of occasions and thereby shifts the reader's frame of reference for the course

of developments.  Finally, *Trials* adopts a very different pace than *Effie*—a pace much closer to

*King*.  The leading examples of this different pace include the substantial front-loading of

character development before John and Effie get married, the intense detail of their first night

together, and the substantial events in London between the trips to Venice and Scotland.

### b.  Plot and Scenes

Many of the alleged similarities in plot and scene between *Effie* and *Trials* have already

been discussed in relation to *King*.  Some of the material unique to *Trials* is not protectible under

*Hoehling*.  This includes Mrs. Ruskin's insistence on treating John herself, the presence of Lady

Eastlake as a friend of Effie, and the fact that Millais hosted a model in his bathtub to play the

role of *Ophelia* for his famous rendering of that tragic tale.  Much of the new material, however,

is genuine fiction and would therefore be eligible for copyright protection if it were not so

plainly dissimilar to *Effie*.  Several of these scenes involve a more direct view of the characters'

sexuality; for example, scenes in which John is repulsed by Effie's underarm hair, Effie

masturbates in bed before trying to undress her husband, and Effie makes bold sexual advances toward Millais. A different set of these scenes render the subtext of John's pedophilic tendencies more explicit than in *King*, including his time with Lily at Greenaway's studio, his collection of drawings in a brown envelope, and his discussion with a little girl in Venice. A third grouping encompasses scenes that lack any analogue in *Effie*: Effie's confrontation with John after discovering him in bed with Sophie, John's threat to ruin Millais' reputation, and the entire final portion of the script (stretching from John's lecture on Millais' painting at the Academy through the train-side rescue of Effie by Millais and her parents). Although widespread differences do not prevent a finding of infringement, "[n]umerous differences tend to undercut substantial similarity." *Durham Indus.*, 630 F.2d at 913 (citation omitted). Here, the similarities are few and minor and the differences are pronounced. Neither plot structure nor scenes support infringement.

### c. Themes

The themes in *Trials* are less developed and thus less subject to ready description than the themes in *Effie* or *King*. References to Ophelia recur throughout *Trials*, but to a markedly lesser extent than in *King* and accordingly to lesser effect. In contrast, John's aversion to mature female sexuality, his pedophilic tendencies, and his oedipally fraught relationship to Mrs. Ruskin are pronounced to an even greater extent in *Trials* than in *King*.[20] As its title suggests, *Trials* focuses to a greater degree on Effie's struggle to overcome the adversity presented by her

---

[20] To the extent that the works shared an oedipal subtext, this interpretation of the relationship between Ruskin and Margaret is not original to either Pomerance or Thompson. *See* Pl. Ex. 39; Pl. Ex. 40; Pl. Ex. 41. Moreover, this idea is expressed very differently in the two works and could not prove infringement even if it were protectible. By the same token, although *Effie* does not suggest a pedophilic subtext and there is thus no question of similarity on the basis of that theme in *Trials* (and *King*), the Court notes that historical evidence supports the conclusion that Ruskin was atypically attracted to young girls. *See* Pl. Ex. 52; Pl. Ex. 53.

situation—a theme that distinguishes *Trials* from *King*, a screenplay in which Effie is ultimately unable to overcome these circumstances and succumbs to an attempt at suicide.  Thus, in *Trials*, Effie is bolder in asserting her sexuality, more aggressive in rebuking John's pedophilic impulses, and more actively engaged toward the end of the movie in the struggle over her fate. To the extent that *Trials* prioritizes this theme, it differs in significant respects from *Effie*, which presents a different account of Effie's struggle to avoid becoming Daphne and of the role played by characters like Lady Eastlake—not Millais and the Grays—in helping Effie liberate herself.

### d. Characters

For the reasons stated above with respect to *King*, the Court concludes that the characters in *Trials* are not substantially similar to the characters in *Effie*.

### e. Overall Concept and Feel

Taken together, the differences discussed above in reference to structure, scenes, plot, pace, theme, and characters defeat any claim that *Effie* is substantially similar to *Trials*.

**IV.      Conclusion**

For the foregoing reasons, Effie Film's motion for judgment on the pleadings is

GRANTED.  The Court holds that Effie Film, LLC is entitled to declaratory judgment that two

works by Eve Pomerance—*The King of the Golden River* and *The Secret Trials of Effie Gray*—

do not infringe either the screenplay or the film *Effie*.

The Clerk of Court is directed to close the motion at Dkt. No. 16 and to close this case.

SO ORDERED.

Dated: New York, New York
       December 18, 2013

_____
             J. PAUL OETKEN
        United States District Judge