Andrew L. Deutsch
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Telephone (212) 335-4500
Facsimile (212) 335-4501

*Attorneys for Plaintiff-Counterclaim*
*Defendant Effie Film, LLC and Counterclaim*
*Defendant Emma Thompson*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

EFFIE FILM, LLC

                    Plaintiff,

         - against -                  11-CV-7087 (JPO)

EVE POMERANCE, a/k/a EVE MOSSEK

                   Defendant.

------------------------------------------------------------- x

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN AWARD OF COSTS AND ATTORNEYS' FEES**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

FACTS RELEVANT TO THE MOTION ........................................................................... 4

ARGUMENT .................................................................................................................... 8

I.     THE COURT SHOULD FIND THAT EFL IS ENTITLED TO A FEE AWARD.......... 8

    A.     The Copyright Act Permits An Award Of Costs And Fees To Plaintiffs At The Court's Discretion ......................................................................... 8

    B.     Pomerance's Infringement Assertions Were Objectively Unreasonable ............... 9

    C.     Considerations of Compensation And Deterrence Warrant A Fee Award Here ................................................................................................... 14

II.    THE COURT SHOULD AWARD FEES AND COSTS IN THE AMOUNT REQUESTED BY EFL ............................................................................................ 15

    A.     The Standards For Calculating a Fee Award ....................................................... 15

    B.     The Court Should Award EFL Attorney's Fees in The Lodestar Amount .......... 16

    C.     The Court Should Award Costs in the Amount of $3,497.88.............................. 18

    D.     The Court Should Award EFL The Attorney's Fees and Costs Incurred In Making This Motion ...................................................................... 19

CONCLUSION ................................................................................................................. 19

Plaintiff-Counterclaim Defendant Effie Film, LLC ("EFL") respectfully submits this memorandum in support of its motion for an award of costs, including reasonable attorney's fees and related non-taxable expenses, pursuant to Fed. R. Civ. P. 54(d) and 17 U.S.C. § 505. EFL is a prevailing party in this action, as the Court's December 18, 2012 Amended Memorandum and Order (the "Opinion") granted EFL's motion for judgment on the pleadings and held that "neither the film *Effie* nor the screenplay *Effie* infringes upon either of Eve Pomerance's two works, *The King of the Golden River* and *The Secret Trials of Effie Gray*." *Effie Film, LLC v. Pomerance,* No. 11 Civ. 7087 (JPO), 2012 WL 6584485, at *34 (S.D.N.Y. Dec. 18, 2012).[1]

EFL requests an award of $96,977.22 in attorney's fees and $3,497.88 in non-taxable expenses. EFL also requests an award of the attorney's fees and expenses incurred by EFL in making this motion, the amount of which EFL will show in a supplemental declaration to be submitted after the motion is fully briefed.

## PRELIMINARY STATEMENT

Congress, in enacting 17 U.S.C. § 505 and giving the courts discretion to award fees in copyright actions, intended to encourage the dissemination of copyrighted works for the ultimate benefit of the public. It also intended to discourage objectively unreasonable claims of copyright infringement, by making the pleader of such claims pay the reasonable legal costs of successful adversary.

Thus, the Court has discretion to award attorney's fees and costs to EFL, the prevailing party, if it determines that Pomerance's infringement claim was objectively unreasonable and an award would further the purposes of the Copyright Act. As will be shown below, all of the factors supporting an award are amply present here.

---

[1]    Further "*" references in this brief are to the pagination of the Westlaw version of the Opinion that appears at 2012 WL 6584485.

Pomerance attempted to prevent *Effie's* production and release by making a claim of infringement that, from the outset, was objectively unreasonable.   In October 2011, Pomerance, through her lawyer, sent EFL a demand letter asserting that the screenplay of *Effie* and the film to be made from that screenplay infringed her screenplay which the letter called "Effie."  (Deutsch Decl., Ex. 6).  At that time, she had the screenplay of *Effie* (May 2010 version), as well as her own screenplays, *The King of the Golden River* ("*King*") and *The Secret Trials of Effie Gray* ("*Trials*"); she knew the historical facts and theories about the lives and relationships of John Ruskin, Effie Gray, and Everett Millais; and she was represented by experienced copyright counsel.  Later that month, she formally confirmed her claim by filing a counterclaim (Dkt. No. 7) asserting that "the EFL Screenplay [i.e., *Effie*] is substantially similar to the Pomerance Screenplay [i.e., *Trials*]," and sought an injunction against production and distribution of the *Effie* film.

By December 2011, Pomerance had been given the final (November 28, 2011 "Venetian White Revisions") version of *Effie* that reflects what was actually filmed.  In February 2012, at the Court's direction, she provided the Court with details of her claims of substantial similarity.  (Dkt. No. 14).  This was a comparison between the final filmed version of *Effie* and *King*, that claimed that over thirty passages in the final version of *Effie* were substantially similar to passages or other creative elements in *King*.  (*Id.*).  EFL's motion for judgment on the pleadings was based on this detailed infringement claim.  (Dkt. No. 16).

The Court's Opinion makes clear that Pomerance's claim was objectively unreasonable from the very start.  No objectively reasonable observer, comparing the screenplays of Emma Thompson's *Effie* to Pomerance's *Trials* and *King*, and disregarding the two screenplays' common uses of unprotectible historical facts and theories, could conclude that there were any meaningful similarities between *Effie* and the protected creative aspects of *Trials* and *King*.  Although both

Thompson and Pomerance both created fictional versions of important events in the lives of Ruskin, Gray, and Millais, the same events are "presented very differently" in the two authors' works (*26 ("first meeting" scene)); the screenplays' treatments are "dramatically different" and in "stark contrast" (*Id.* ("wedding night scene")); and feature "very different" treatments and use of events for character and plot development. (*27 ("Venice trip" scene)). The observer would also find obvious differences in narrative structure and pace, themes that have "stark differences"(*31), and characters that are "interpret[ed] . . . in strikingly different ways." (*32). As the Court concluded, such a comparison would lead the observer to conclude that Thompson did not copy "any significant amount of protectable material" from *King* and that any similarities are "scattered and incidental rather than 'substantial.'" (*33). The objective observer would find even fewer and less significant similarities in comparing *Effie* to *Trials*. (*33).

In short, Pomerance's infringement claim, based on assertions of substantial similarity, was objectively unreasonable from day one. EFL should be awarded its reasonable attorney's fees and costs in successfully establishing that *Effie* (screenplay and film) does not infringe.

An award of fees here would further Congress's purposes in enacting the Copyright Act, which are principally to encourage the creation of new works. Emma Thompson's screenplay for *Effie* and the film of *Effie* are important new works that provides an imaginative view of the difficulties faced by independent-minded women in Victorian England, and breathe new creative life into historical characters that most people have forgotten. EFL brought Thompson's vision to reality by investing extensive time in developing the film of *Effie*, including obtaining financing from multiple investors, hiring a stellar cast and crew, and so forth.

Pomerance's unreasonable infringement claims and injunction demand threatened to bring this entire creative enterprise to a halt. EFL was compelled to start this declaratory judgment

lawsuit, and promptly seek judgment on the pleadings.  Nothing less than full exoneration by the

Court would have eliminated the risk of an injunction or money damages.  Nothing less would

have cleared away the stain that Pomerance's reckless infringement claims cast upon the integrity

of Emma Thompson, which would have injured the economic prospects of the film of *Effie*.  An

award here will serve Congress's purposes by shifting the costs of defending Pomerance's

meritless claims from the investors in *Effie* to the party that asserted the claims; by incentivizing

other writers and producers to create new works, because they know they will have the economic

means to defend their projects against reckless or extortionate claims of infringement; and by

serving as a visible disincentive to others who would make such claims in the future.

## FACTS RELEVANT TO THE MOTION

The procedural history of this case, as well as the contents of the parties' screenplays, are

fully discussed in the Court's Opinion, and will not be repeated here except as they are relevant to

this motion.

On October 4, 2011, Pomerance, through her experienced copyright attorney, sent a letter

to counsel for EFL.  (Deutsch Decl., Ex. 6).  This letter stated that Pomerance had accessed a copy

of the screenplay of *Effie* "as a result of the Murphy litigation in the Southern District of New

York."  (*Id.*).  This screenplay was the May 2010 version of *Effie*.  Pomerance asserted that there

were "striking similarities" between Thompson's *Effie* screenplay and Pomerance's "Effie" (in

reality, *Trials*).  She gave a list of eleven purported similarities.  (*Id.*).  She asserted that *Effie* is "an

infringing work" and that the infringement "will carry through to any film based on that script."

(*Id.*).

Pomerance included every one of these eleven "similarities" identified in either or both of

(1) her February 17, 2012 document (Deutsch Decl., Ex. 11) which purported to compare and

show actionable, non-historical similarities between the final version of *Effie* and *Trials*, and (2)

the comparisons contained in her supplemental briefing of June 7, 2012. (Dkt. No. 28). EFL, in

its motion papers and supplemental briefing, refuted each of these claims. The Court's Opinion

addressed many of the alleged similarities as well, and found that they involved either material

clearly not protected by copyright, or that there was no similarity as to expression. *See, e.g.*, *25

(as a historical fact, John and Effie lived in the elder Ruskins' house); *27 (while *Effie* and the

Pomerance screenplays both posit the idea that Ruskin discovered Effie and Millais's affair while

in Scotland, "the expression of that idea . . . is entirely different across the two works."); *27

(rejecting Pomerance's claim of similarity in the "Venice trip" scenes, finding that "the works'

treatments of their time in Venice as well as the works' use of that trip for character and plot

development, are very different"); *27 (rejecting claim that the works are similar in showing Effie

in an "extravagant dress"); *34 n.20 (claim that both works referred to an oedipal relationship

between John and his mother found to be "not original to either Pomerance or Thompson). The

remainder the Court found too immaterial to warrant consideration.

Because Pomerance's accusations and threatened lawsuit imperiled the making and release

of *Effie*, EFL was compelled to promptly seek judicial relief, by bringing this action for a

declaratory judgment of non-infringement. Before doing so, however, EFL's counsel warned

Pomerance's counsel that if litigation was necessary, EFL would seek its legal fees at the

conclusion of the litigation. (Deutsch Decl. ¶ 19). Yet Pomerance "doubled down." She asserted

a copyright infringement counterclaim which sought, in addition to money damages, "an order

permanently enjoining the production of and distribution of a film based on the infringing EFL

Screenplay." (Dkt. No. 7, at 12).

By letter of November 23, 2011, EFL proposed to the Court to provide Pomerance's

counsel with the final version of the *Effie* screenplay, in return for her providing EFL with the

version of *Trials* which Thompson and her husband, Greg Wise, allegedly had access to, and to have Pomerance identify in writing any claimed actionable similarities between *Trials* and "either version of *Effie*." Thereafter EFL would brief and submit a motion for judgment on the pleadings. The Court memo-endorsed this order on December 14, 2011. (Dkt. No. 10). On December 22, 2011, EFL's counsel provided the final, November 28, 2011 version of *Effie* to Pomerance's counsel. (Deutsch Decl. ¶ 21). Pomerance thus had the final version of *Effie* when she prepared her comparison of the screenplays.

By its order of January 26, 2012, the Court reissued its order to the parties, and directed Pomerance to provide EFL with "a document identifying any claimed actionable similarities between *The Trials of Effie Gray* and either version of *Effie*." (Dkt. No. 12). She responded, on February 17, 2012, with a comparison that her counsel represented complied with the Court's order. (Deutsch Decl., ¶¶ 23-26, Ex. 11). This comparison, however, was not to *Trials* but to a different screenplay, *King*, and compared *King* to the final, November 2011 version of *Effie.*.

After EFL moved for judgment on the pleadings, Pomerance sought several extensions of her time to oppose the motion or move to dismiss. Eventually, however, she sent her letter of May 8, 2012, stating that she would drop her Counterclaim. (Dkt. No. 25). The parties then completed briefing on the motion for judgment on the pleadings. Opinion, at *1.

 Pomerance has taken the position that she dropped her Counterclaim because her claims of infringement were really asserted against the May 2010 version of *Effie*, not the final November 2011 version of *Effie*. To this end, in June 2012, she submitted two comparisons, one of *King* to the May 2010 *Effie*, and a second of *Trials* to the May 2010 *Effie*. Pomerance's new-found assertion—that she only claimed infringement against the May 2010 *Effie*—cannot be squared with her prior conduct. It can only be seen as an attempt to evade or limit a fee award.

First, Pomerance's February 2012 comparison, which responded to the Court's direction to show "claimed actionable similarities" between *Effie* and her works, uses only actual reproductions of pages from the *final* November 2011 version of *Effie*—the version that EFL provided to her counsel after she asserted her counterclaim.   To demonstrate: Example 1 of that comparison contains a copy of scene 114 of *Effie*, which contains dialogue which both Thompson and Pomerance took from John Ruskin's own writings.   That dialogue is in scene 114 only in the final version of *Effie*; in the May 2010 version, the dialogue appears in scene 107. Example 3 contains copies of pages from scenes 29 (the wedding night), 2 (the first meeting of John and Effie), and 132 (Effie being taught to paint by Millais) of the final version of *Effie.* Only in the final version does Effie say "we should have some perfection for pudding," and tells Millais that his nose is "perfect again"; that dialogue is not in the earlier version.

Second, Pomerance's apparent assertion—that Thompson somehow rewrote *Effie* so as to eliminate all allegedly infringing material from the final work—does not hold water.   While the November 2011 final version of *Effie* does delete certain scenes present in the May 2010 version of *Effie*, and contains some rewriting, Thompson did not make any significant changes in the plot, scenes, pacing, themes or characters of *Effie*.[2]   Not surprisingly, Pomerance's February 2012 and June 2012 claims of actionable similarities are almost identical.   (*See* Dkt. No. 32, App. I (Pl.'s Suppl. Ltr. Br., June 21, 2012)).   The only one of the  30-plus similarities that Pomerance claimed

---

[2]      The only significant differences between the two scripts are: the disastrous wedding night is depicted in greater detail in the earlier version of *Effie*, but is still entirely different in expression from the depiction of the same historical event in *Trials* and *King* (*see* Dkt. No.18, at 17-18 (Pl.'s Joint Mem. in Supp. of J. on Pleadings)); the pre-Exhibition "Royal Academy" dinner scene in the final *Effie* script was set in the Exhibition Gallery itself in the May 2010 version; the role of Anna, the Ruskin maid, is much diminished in the final version; and the scene in the Ruskin household of a private conversation between Effie and Lady Eastlake is expanded to refer to the impossibility of obtaining a divorce and John's dislike of children.

in the June 2012 comparisons but did not assert in the February 2012 comparison involves Effie's

dancing at a Venetian masked ball, which was in the May 2010 version of *Effie* but was omitted

from the final version for cost reasons.

## ARGUMENT

## I.        THE COURT SHOULD FIND THAT EFL IS ENTITLED TO A FEE AWARD

### A.        The Copyright Act Permits An Award Of Costs And Fees To Plaintiffs At The Court's Discretion

The Copyright Act permits a court to "allow the recovery of full costs by or against any

party," and to "award a reasonable attorney's fee to the prevailing party as part of the costs."  17

U.S.C. § 505.  The decision to award costs and fees to a prevailing party under § 505 rests within

the sound discretion of the Court.  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994); *Matthew

Bender & Co. v. West Publ'g  Co.*, 240 F.3d 116, 121 (2d Cir. 2001); *Knitwaves, Inc. v. Lollytogs

Ltd.*, 71 F.3d 996, 1011 (2d Cir. 1995).  Courts in this District routinely grant such awards to

prevailing parties under § 505.  *See, e.g., Pyatt v. Raymond*, No. 10 Civ. 8764 (CM), 2012 WL

1668248 (S.D.N.Y. May 10, 2012); *Harrell v. Van Der Plas*, No. 08 Civ. 8252 (GEL), 2009 WL

3756327 (S.D.N.Y. Nov. 9, 2009); *Porto v. Guirgis*, 659 F. Supp. 2d 597, 617 (S.D.N.Y. 2009)

(Koeltl, J.); *Mallery v. NBC Universal, Inc.*, No. 07 Civ. 2250 (DLC), 2008 WL 719218, at *1

(S.D.N.Y. Mar. 18, 2008).

In *Fogerty*, the Supreme Court held that "[p]revailing plaintiffs and prevailing defendants

are to be treated alike."  510 U.S. at 534.  Thus, parties accused of copyright infringement have

been deemed to be prevailing parties, entitled to a fees award, where they establish that their works

do not infringe the works of the accuser.  *See, e.g.*, *Muller v. Twentieth Century Fox Film Corp.*,

2011 WL 3678712 (S.D.N.Y. Aug. 22, 2011);  *Vargas v. Transeau*, 04 Civ. 9772 (WHP) 2007 WL

1346618 (S.D.N.Y. May 9, 2007); *Porto*, 659 F. Supp. 2d at 617.  Here, EFL is a prevailing party

within the meaning of § 505.  The Opinion establishes that *Effie* does not infringe copyright in either of Defendant's screenplays and grants EFL the declaratory judgment sought in its complaint.

*Fogerty* identified several non-exclusive factors that courts should consider in deciding whether to award fees: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  510 U.S. at 534, 535 n.19.  *See also Knitwaves*, 71 F.3d at 1011-12.  The Court's application of these factors must be "faithful to the purposes of the Copyright Act."  *Id.*

Of the so-called *Fogerty* factors, "objective unreasonableness" is paramount.  The Second Circuit has held that courts should give "substantial weight" to this factor in deciding whether to award fees to a prevailing party.  *Matthew Bender & Co.*, 240 F.3d  at 121.  Courts have made fee awards based solely upon a finding of objective unreasonableness.  *See e.g.*, *Harrell*, 2009 WL 3756327, at *3 ("objective unreasonableness … is sufficient to subject a party to an award of attorney's fees under § 505 'without regard to any other equitable factor.'" (quoting *Hudson v. Universal Studios, Inc.*, No. 04 Civ. 6997, 2009 WL 536564, at *2 (S.D.N.Y. Mar. 4, 2009)); *Porto*, 659 F. Supp. 2d at 617 (citing *Diplomatic Man, Inc. v. Nike, Inc.*, No. 08 Civ. 139 (GEL), 2009 WL 935674, at *3 (S.D.N.Y. Apr. 7, 2009)); *Mallery*, 2008 WL 719218, at *1 (citing *Adsani v. Miller*, No. 94 Civ. 9131(DLC), 1996 WL 531858, at *13 (S.D.N.Y. Sept. 19, 1996)).   The fee applicant does not have to show that the claim was frivolous.  *See Pyatt*, 2012 WL 1668248, at *3 (citing *Sparaco v. Lawler, Matusky, Skelly Eng'rs LLP*, 60 F. Supp. 2d 247, 258-59 (S.D.N.Y. 1999); *Williams v. Crichton*, 891 F. Supp. 120 (S.D.N.Y. 1994)).

## B.    Pomerance's Infringement Assertions Were Objectively Unreasonable

"A copyright infringement claim is objectively unreasonable when the claim is clearly without merit or otherwise patently devoid of a legal or factual basis."  *Porto*, 659 F. Supp. 2d at

617 (internal quotations and citations omitted); *accord, Muller*, 2011 WL 3678712, at *2-3. Pomerance's claim of copyright infringement was objectively unreasonable from the time it was first asserted in October 2011, and remained so through her attempt to defend that claim in supplemental briefing.

There is a close similarity, if not identity, between the standard courts apply in deciding a Rule 12(b) motion to dismiss a copyright infringement claim for lack of substantial similarity (or a Rule 12(c) motion for a declaratory judgment of non-infringement), and the standard they apply in determining whether the same infringement claim is "objectively unreasonable."  In both situations, the Court is to determine whether an objective "reasonable reader," who is instructed in the law of copyright, and compares the original and allegedly infringing works, could conclude that the accused work is substantially similar to protected elements of the original work.  If no reasonable reader (sitting as a juror) could find substantial similarity after that comparison, the claim must be dismissed; and the claim is likewise objectively unreasonable.  *See Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010); *Porto*, 659 F. Supp. 2d at 618.

As noted in the Opinion, the legal framework for analyzing infringement of works of historical fiction was well-settled before Pomerance first asserted her claim.  *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991), and *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 974 (2d Cir.1980) had established that historical facts, being not original, and theories, being ideas to which all must have access, are not protected by copyright.  (*19-20). Further, it had been long the law that a court, in conducting a substantial similarity analysis, must exclude claimed similarities involving material in the claimant's work that are not protected by copyright, and consider only the protectable elements of that work.  (*14-15) (describing the

"more discerning" observer test).   The process for analyzing the creative elements of fictional narratives for substantial similarity, by comparing such matters as plot development, pacing, scenes, settings and characterizations, had likewise been established by precedent. (*21).   Because Pomerance was represented by experienced copyright counsel from the outset, she is charged with knowledge of the law on substantial similarity.[3]

The Court's Opinion engaged in a very detailed dissection of *Effie* and *King/Trials*, and a thorough comparison of the screenplays at issue.   Its findings show that no objectively reasonable observer would have found any merit to Pomerance's claim of substantial similarity.   In fact, the Court did not identify a single meaningful similarity in protected expression.

The only similarities between *Effie* and *King* arise from the fact that both "are based on the same historical figures, cover the same period of time, and focus on the same set of relationships," and, as a matter of law, these unprotectible similarities "do not count toward a finding of substantial similarity."  (*25).   The Court found no actionable similarity between the creative fictional elements of *Effie* and *King*.   The key scenes and the plot are "presented very differently in the two works" (*26); are "dramatically different" (*27); and are "very different."  (*Id.*).   Even where the authors use the common idea that John discovered the affair in Scotland, their dramatic treatment of the idea is "riddled with so many differences in expression and execution that it cannot be deemed substantial."  (*Id.*).

---

[3]       In fact, on October 5, 2011, the day after receiving Defendant's demand letter, counsel for EFL provided Defendant's counsel with copies of decisions in *Muller* and *Gilbert v. New Lines Prods. Inc.*, No. CV-09-02231-RGK (RZx), 2010 WL 5790688 (C.D. Cal. Dec. 6, 2010), in which the courts analyzed these legal issues and awarded attorneys' fees to production companies alleged to have infringed the screenplays of the plaintiffs.  (Deutsch Decl., ¶ 19, Ex. 7).  Defendant ignored this timely warning and pressed ahead with her copyright infringement counterclaim.

Likewise, the works, while they generally track historical events, have substantial "overall differences in pace and structure." (*28). The themes are entirely different: *Effie* focuses on the classical ideal of perfection; while *King* and *Trials* focus on Shakespearean themes with an overlay of "pedophilia and oedipal desire." (*Id.*) There are "critical differences at the level of subthemes and narrative devices," and "stark differences" that "weigh[] strongly against a finding of substantial similarity." (*30-32). While Thompson and Pomerance work with the same historical characters, "they interpret these characters in strikingly different ways." (*Id.*). In reviewing the works as a whole, the Court concluded what the objective observer would also find: "the works are different in many critical respects and the occasional similarities are scattered and incidental rather than 'substantial.'" (*33). As for *Trials*, the Court found the similarities between *Trials* and *Effie* to be "even fewer in number and importance than the similarities between *King* and *Effie*." (*Id.*).

Defendant's infringement claim is very much like the claims in *Muller*, *Porto*, and *Mallery*, which were each found to be objectively unreasonable and subject to a fee award. In *Muller*, the court found that the defendant's film and plaintiff's screenplay "tell two very different stories," and that many of the claimed similarities were not at all similar. 2011 WL 3678712, at *3. In *Porto*, both defendants' play and plaintiff's novel told of a "modern day trial on the issue of whether Judas Iscariot should be allowed into heaven," and shared similar, yet unprotectible, characters, themes, and ideas. 659 F. Supp. 2d at 606, 610-14. The court stripped away the unprotectible elements of the works at issue—the biblical story and its characters—and, after careful consideration of the works' protectible elements, summarily dismissed plaintiff's claims, holding that, "[a]s a matter of law, no ordinary observer would regard these works as substantially similar." *Id.* at 616. It concluded that the claims were objectively unreasonable and wholly without merit because plaintiff could not "demonstrate a single similarity among the protectible elements of his

work and the defendants' work."  *Id.* at 618.  S*ee also Mallery*, 2008 WL 719218, at *1 (holding

that the plaintiff's copyright infringement claims were "wholly without merit, as nearly every

instance of alleged similarity between [the defendants' television show] and the plaintiffs' [novel]

relates to unprotectible ideas rather than protectible expression and, viewed more broadly, the total

concept and feel of these works are profoundly different.").  Pomerance's infringement claim was

also "clearly without merit or otherwise patently devoid of legal or factual basis." *Porto*, 659 F.

Supp. 2d at 617.

The Court should not be distracted by the new argument that Pomerance made once she

received EFL's motion papers.  She began to assert that her claim of infringement really addressed

only the May 2010 version of *Effie*, which she had seen before sending her October 2011 demand

letter and filing her counterclaim, but not the final November 2011 version.  This is plainly a tactic

intended to avoid or limit Pomerance's exposure to a fee award.

Pomerance's new story is not consistent with her own conduct.  When she detailed her

infringement claims (in her February 2012 comparison), her reference was exclusively to the final

November 2011 version of *Effie*.  *See supra* at 6-7.  Moreover, when she submitted her June 2012

comparison, almost all of the passages that she identified as substantially similar in the May 2010

version of *Effie* were also present in the final November 2011 version of *Effie*.  *Id.*  This is not

surprising, because Thompson made relatively few changes between the May 2010 and November

2011 versions of her screenplays.

Thus, while Pomerance may have given up her copyright infringement counterclaim, she

never abandoned the position that the *substance* of the final screenplay version of *Effie* and the film

of *Effie* infringed her copyrights in *King* and *Trials*.  That position, which she pursued to the end,

was also objectively unreasonable.  Moreover, Pomerance's persistence in this meritless claim

made it necessary for EFL, in order to establish entitlement to a declaratory judgment of non-infringement for the final screenplay and film of *Effie*, to also show that the May 2010 version of *Effie* was non-infringing.  The Court should therefore allow EFL its fees and expenses incurred in supplemental briefing.

## C.       Considerations of Compensation And Deterrence Warrant A Fee Award Here

The policy considerations underlying the Copyright Act further support an award here. "The primary purpose of the Copyright Act is to 'encourage the origination of creative works by attaching enforceable property rights to them.'" *Porto*, 659 F. Supp. 2d at 618 (quoting *Matthew Bender & Co. v. West Publ'g Co*., 240 F.3d 116, 122 (2d Cir. 2001).  Because attorneys' fees awards are limited to objectively unreasonable cases, they do not aim to deter plaintiffs with reasonable claims from asserting their rights in court. *Porto*, 659 F. Supp. 2d at 618.

A fee award is appropriate here both for purposes of deterrence and compensation.  Not requiring Pomerance to bear the costs of her unreasonable lawsuit would simply "invite others to bring similarly unreasonable actions without fear of any consequences."  *Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 359-60 (S.D.N.Y. 2006) (quoting *Earth Flag. Ltd. v. Alamo Flag Co.*, 154 F. Supp. 2d 663, 668 (S.D.N.Y. 2001)).  In addition, parties who successfully defend against unreasonable copyright claims should not be required to bear the costs of that defense. Allowing fees in such situations will incentivize the development of new creative works, by encouraging creators and their investors to fight unreasonable or extortionate plaintiffs in court, rather than cave in to demands for money.

Here, *Effie* is not a studio film: it is an independent production, made possible only by the diligence of an experienced producer and the willingness of numerous investors to risk their money on bringing a serious, literate film to an adult public.  Unless this Court grants this motion, every dollar that EFL has incurred for legal fees in this lawsuit will be one dollar less to be paid back to

the investors who took a chance in backing the movie. An award of fees will fulfill the purposes of the Copyright Act by shifting the economic burden of defending *Effie*'s creative independence from the film's investors to the party that inflicted that cost.

## II.   THE COURT SHOULD AWARD FEES AND COSTS IN THE AMOUNT REQUESTED BY EFL

### A.   The Standards For Calculating a Fee Award

Calculation of a prevailing party's fee award under 17 U.S.C. § 505 begins with determination of the "presumptively reasonable fee." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 111 (2d Cir. 2007), *amended on other grounds*, 522 F.3d 182 (2d Cir. 2008).  This fee is "'what a reasonable, paying client would be willing to pay,' given that such a party wishes 'to spend the minimum necessary to litigate the case effectively.'"  *Simmons v. N.Y. City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009), quoting *Arbor Hill*, 493 F.3d at 112, 118.

The starting point calculation is the "lodestar," determined by "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" and "evidence supporting the hours worked and the rates claimed."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  Both the Second Circuit and the Supreme Court have held that the lodestar creates a "presumptively reasonable fee."[4]  *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir.

---

[4] Courts also consider the twelve factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974): "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."  *T.K. ex rel. L.K.*, 2012 WL 1107660, at *5 (S.D.N.Y. Mar. 30, 2012) (citing *Johnson* and *Arbor Hill*, 522 F.3d at 187 n.3.).  However, the Second Circuit has made clear that "the presumptive reasonability of the lodestar method means that absent extraordinary circumstances, failing to calculate it as a starting point is legal error."  *Id.* at *5, n.4 (citing *Millea*, 658 F.3d at 166).

2011); *Arbor Hill*, 522 F.3d at 183 (2d Cir. 2008).  When determining a reasonable amount for attorneys' fees, courts should consider "what a reasonable, paying client would be willing to pay." *Arbor Hill*, 522 F.3d at 184.  This rate should be in line with the prevailing market rates in this District for attorneys "of reasonably comparable skill, experience and reputation."  *Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006).

**B.  The Court Should Award EFL Attorney's Fees in The Lodestar Amount**

The lodestar in this case, and the amount of reasonable attorney's fees that the Court should award, are the attorney's fees actually incurred by EFL, in the amount of $96,977.22. The initial focus is on whether the hourly rates requested by the plaintiff appear reasonable.  *Arbor Hill*, 493 F.3d at 117.  Here EFL is asking for an award based on the actual hourly rates it agreed to pay to DLA Piper, which includes an agreed-to discount of 10% for 2011 and 12% for 2012. The actual billing rate agreed to by the prevailing party and its counsel "provides a strong indication of what private parties believe is the 'reasonable' fee to be awarded."  *Crescent Publ'g Group, Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 151 (2d Cir. 2001).

Andrew Deutsch, a senior partner of DLA Piper with extensive copyright experience, and who is also handling the *Murphy* litigation for EFL, performed most of the legal work on this action.  His hourly rate, after discount, was $756 in 2011 (10% discount) and $770 in 2012 (12% discount).  The hourly rates charged by DLA Piper for Mr. Deutsch's time are the same rates that the firm charges for Mr. Deutsch's time to other clients of the firm.  Before and after discount, they are consistent with the prevailing market rates charged by other New York City firms for senior lawyers with extensive copyright litigation experience, and which have been found reasonable in fee awards made in this District.  *See, e.g.*, *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, No. 06 Civ. 4908 (DLC), 2010 WL 2640095 (S.D.N.Y. June 30, 2010) (granting a fee award to the prevailing plaintiffs which included time of a senior partner at

Weil Gotshal & Manges billed at an average hourly rate of $838, and a junior partner billed at an average hourly rate of $639 (Deutsch Decl., Ex. 5))[5]; *Diplomatic Man, Inc. v. Nike, Inc*, No. 08 Civ. 139 (GEL), 2009 WL 935674, at *6 (S.D.N.Y. Apr. 7, 2009). (New York partner billing rate of $650 held "perfectly reasonable.").

While Mr. Deutsch's rates were higher than those of firm associates, the cost-effectiveness and avoidance of duplication gained from his expertise more than made up for the incrementally higher rate.  (Deutsch Decl. ¶¶ 11-12).  Outside of a paralegal, whose services were essential to the preparation of the exhibit-heavy motion for judgment on the pleadings, other DLA Piper lawyers and timekeepers had only minor participation in the work.

This motion is also supported by DLA Piper's contemporaneously created time records, which reflect in detail the "date, the hours expended, and the nature of the work done" by each timekeeper.  *Bliven v. Hunt*, 579 F.3d 204, 213 (2d Cir. 2009).  The time records were used to generate DLA Piper's invoices to EFL (Deutsch Decl., Ex. 1) and are also provided to the Court in tabular form.  (*Id.*, Ex. 2).  These are in proper form, as they "describe generally the tasks performed" each day "and the number of hours expended in tenth-of-an-hour increments," *Barclays Capital Inc.*, 2010 WL 2640095, at *2, as well as the dollar value before discounting of each timekeeper's daily recorded time.

To the extent the Court wishes to consider them, the relevant *Johnson* factors also support an award of the lodestar amount in attorney's fees.  (Deutsch Decl. ¶¶ 17-39).  For example, the time expended by DLA Piper on the matter was consistent with the substantial burden and difficulty presented by the motion and Pomerance's numerous changes in position.

---

[5]     The liability determination against the defendant in *Barclays Capital* was reversed by the Second Circuit in *Barclays Capital Inc. v. The flyonthewall.com, Inc.*, 650 F.3d 876 (2d Cir. 2011), which had the effect of vacating the district court's fee award.

(*See* Deutsch Decl. ¶¶ 17-28).  EFL's  initial motion papers summarized both screenplays, analyzed the law of copyright (particularly as it related to judicially-noticeable historical facts and theories), identified and filtered out the shared historical facts, and analyzed the remaining expression in terms of the relevant literary dimension.  EFL had to ask the Court for permission to serve a 35-page brief in order to deal with all the issues.  Then, when Pomerance began to argue that her claim related to the May 2010 version of Effie, and submitted *two* new comparisons, EFL had to respond to each of these new comparisons and arguments in supplemental briefing.  The time reflected in DLA Piper's records and invoices was necessary to EFL's eventual complete success in this action .

EFL therefore requests that the Court award the full lodestar amount of $96,977.22.

## C.    The Court Should Award Costs in the Amount of $3,497.88

17 U.S.C. § 505 permits the Court, in its discretion, to award "full costs" to a prevailing party, meaning the reasonable non-taxable expenses incurred by that party's counsel in prosecuting the successful action or defense.  Fed. R. Civ. P. 54(d).  Courts "routinely award costs to the prevailing party in copyright cases." *Arclightz & Films Pvt. Ltd. v. Video Palace Inc*., 303 F. Supp. 2d 356, 365 (S.D.N.Y. 2003) (collecting cases); *National Football League v. PrimeTime 24 Joint Venture*, 131 F. Supp. 2d 458, 484 (S.D.N.Y. 2001) (quoting *Antenna Television, A.E. v. Aegean Video, Inc.*, No. 95-CV-2328, 1996 WL 298252, at *14 (E.D.N.Y. Apr. 23, 1996)).

Here, the costs incurred by DLA Piper in the case were reasonable and necessary.  They include the costs of effecting service on Pomerance, filing fees, legal research which is billed to the client at DLA Piper's cost, expedited registration of copyright in the November 2011 final version of *Effie* to avoid any question as to whether that work could be the subject of this declaratory judgment action of non-infringement (*see* 17 U.S.C. § 411), and purchase and borrowing of certain

books from which the exhibits in EFL's motion were taken.  These expenses are itemized in

Exhibit 3 to the Deutsch Declaration, and were also set forth in DLA Piper's invoices to EFL.

**D.     The Court Should Award EFL The Attorney's Fees and Costs Incurred In Making This Motion**

Finally, the Court should award EFL the fees and expenses incurred in prosecuting this fee

motion.  Where a statute permits an award of fees and costs to a prevailing party, the courts have

consistently held that a fee award should include the party's fees and costs incurred on a motion for

fees.  *INS v. Jean*, 496 U.S. 154, 161 (1990); *Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir. 1979) (if

such fees were not available, this would "dilute the value of a fees award by forcing attorneys into

extensive, uncompensated litigation in order to gain any fees").  Fees for prosecuting a fees motion

are properly awarded in copyright infringement cases.  *Yurman Designs, Inc. v. PAJ, Inc.*, No. 98

Civ. 8697 (RWS), 2001 WL 797474, at *1 (S.D.N.Y. July 12, 2001), *aff'd*, 29 F. App'x 46 (2d Cir.

2002).

Since EFL fully prevailed in this Litigation, and is entitled to a full award of its fees and

costs, the Court should likewise award the full fees and expenses of prosecuting this fees motion.

EFL proposes that at the close of briefing and any argument on this motion, EFL will provide the

Court with a declaration and exhibits documenting the attorney's fees and costs incurred on this

motion, which the Court may then include in its final award.

## CONCLUSION

For the reasons set forth above, the Court should grant EFL's motion, and award EFL (a)

attorney's fees on the main action in the amount of $96,977.22, (b) non-taxable expenses on the

main action in the amount of $3,497.88, and (c) the reasonable attorney's fees and non-taxable

expenses incurred on behalf of EFL in connection with the motion, in an amount to be proven as

described above.


Dated:  New York, New York
            January 11, 2013

                                                    DLA PIPER LLP (US)


                                                    By  */s/ Andrew L. Deutsch*
                                                            Andrew L. Deutsch
                                                    1251 Avenue of the Americas
                                                    New York, NY 10020
                                                    (212) 335-4500
                                                    Fax: (212) 335-4501
                                                    andrew.deutsch@dlapiper.com

                                                    *Attorneys for Plaintiff-Counterclaim
                                                    Defendant Effie Film, LLC and Counterclaim
                                                    Defendant Emma Thompson*